# IN THE SUPREME COURT OF IOWA

No. 101 / 06-0478

Filed February 8, 2008

**STATE OF IOWA,**

Appellee,

vs.

**ERROL EDWARD DECKER,**

Appellant.

Appeal from the Iowa District Court for Linn County, Douglas S. Russell (suppression) and Marsha M. Beckelman (trial and sentencing), Judges.

Criminal defendant appeals conviction based upon the introduction of a police interrogation video during rebuttal, which had been suppressed during the case-in-chief for due process and *Miranda* violations. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Dennis D. Hendrickson and Stephan J. Japuntich, Assistant State Appellate Defenders, for appellant.

Thomas J. Miller, Attorney General, Mary E. Tabor, Assistant Attorney General, and Harold Denton, County Attorney, for appellee.

**APPEL, Justice.**

In this case, we must decide whether a videotaped interrogation, suppressed during the State's case-in-chief for constitutional violations, can be admitted as rebuttal evidence to combat an insanity defense. The trial court admitted the videotape, on the State's motion, as evidence of the defendant's demeanor less than twenty-four hours after commission of the assault. The defendant claims that the admission of the videotape violated his Fifth and Fourteenth Amendment rights by impermissibly using invocations of his right to remain silent as evidence of sanity. At the conclusion of a bench trial, the court convicted the defendant of attempted murder, burglary in the first degree, and willful injury. For the reasons set forth below we affirm.

## I. Factual Background and Prior Proceedings.

The evidence at trial showed that Amy McNeal, a young mother and Cedar Rapids native, began dating Errol Edward Decker, the defendant, in August 2003. The couple's year-long relationship was a tumultuous one, punctuated by a series of breakups and reconciliations. Finally, McNeal permanently ended the relationship in July 2004. Thereafter a series of increasingly bizarre and violent events occurred. McNeal's dog disappeared. After several days, she recovered the animal. Although Decker claimed not to have been involved, McNeal thought otherwise. Fearing for the safety of herself and her thirteen-year-old son Jacob, McNeal unsuccessfully attempted to obtain a no-contact order. On the advice of local police, however, McNeal sent Decker a letter detailing her wish to have no further contact with him.

On August 24, 2004, just days after the Linn County Sheriff's Department delivered the letter, McNeal returned home around noon to care

for her dog. Although it was her routine to return home each day, she usually did not take her lunch hour until one o'clock. After taking the dog outside, McNeal immediately noticed that her attic door was ajar and the rug normally pushed against it had been moved. As she went to investigate, Decker emerged from the hallway and attacked her. Decker repeatedly hit McNeal with a hammer on her head and neck and stabbed her with a knife in her chest, stomach, and back. McNeal testified that she had never seen the knife used in the attack before, but believed that the hammer could have come from a tool kit in her home.

According to the State's evidence, McNeal attempted to fight Decker off and begged for her life. Decker responded that McNeal "was dead," "that she had ruined his life," and that he had already killed her son Jacob. The attack eventually progressed to Jacob's bedroom. At some point, Decker headed to the basement and called for "boy," and then for "Ted." No one responded. McNeal used Decker's momentary absence to call 911. Before the call connected, however, Decker returned, hitting her on the head with the hammer and choking her around the neck. Decker finally left the home after McNeal promised not to call the police.

Investigating police did not find anyone in the home, nor did they immediately locate an acquaintance of Decker's named Ted. McNeal testified that she did not see anyone besides Decker at any point before, during, or after the attack. Exhibits introduced by the State showed Decker's point of entry as a basement window. Jacob was later located, unharmed, at his school.

On the urging of his family, Decker turned himself in to the Iowa City Police Department and was transported to the Linn County jail. Upon arrival at the jail, Decker was arrested for attempted murder. The following

morning, Detective Anne Deutmeyer initiated Decker's interrogation. At the outset, Deutmeyer verbally informed Decker of his *Miranda* rights. She also presented Decker with a written statement of his *Miranda* rights for signature. When Decker did not sign the document, Deutmeyer asked him if he understood the information on the sheet. Decker responded, "I can read." About a minute later, Deutmeyer asked Decker whether he wanted to talk to her, and Decker responded "not really." When Deutmeyer continued her questioning, Decker was lethargic, routinely gazed at the floor, and was only minimally responsive to questioning. During the next twenty minutes, Deutmeyer repeatedly asked the defendant if he wanted to talk to her. In response, Decker either did not reply or stated that "I don't want to talk about it" or "I don't have nothing to say about it."

The State charged Decker with attempted murder, burglary in the first degree, and willful injury. He entered a plea of not guilty, and later asserted the affirmative defenses of insanity and diminished capacity. After several requests to represent himself, the court appointed Decker a new attorney. Decker then moved to suppress videotaped statements he made during his interrogation.

The motion to suppress was heard by Judge Douglas Russell. Judge Russell granted defendant's motion to suppress, finding that the detective failed to honor Decker's repeated invocations of his right to remain silent. Further, Judge Russell held that Deutmeyer made a promise of leniency in violation of Decker's right against self-incrimination. As a result, Judge Russell ruled that any statements made by Decker during the interrogation be suppressed.

The matter came to a bench trial on August 15 before Judge Marsha Beckelman. At trial, the State presented detailed testimony about the

assault from the victim, Amy McNeal. The State further offered testimony from two Cedar Rapids police officers. The officers testified that Decker refused to say anything about the crime during transport to the Linn County jail. His demeanor was described as "very quiet, sweaty, just sat quietly in the back of our squad car."

In response, Decker put forth an insanity defense. His first witness was Susan Blome, a long-time registered nurse with experience in providing assessments of and medical monitoring for Linn County jail inmates. She testified that Decker was on suicide precaution while being held prior to trial. In records, she noted that Decker had difficulty tracking and answering questions. Blome characterized his mood as "vacant," affect as "restricted," and facial expressions "flat." She also described Decker as alert and oriented, knew the date and where he was, and that his speech rate and rhythm were normal. Blome noted that Decker reported "psychotic symptoms" including hallucinations, auditory [sensations], and paranoia. During his stay in the Linn County jail, Decker reported that he heard voices and requested an increase in medication. Ultimately, Dr. Ali Safdar diagnosed Decker as "probable bi-polar with psychotic symptoms." At the time of his diagnosis, Dr. Safdar noted that Decker was not hearing voices.

Additionally, Decker offered expert testimony from Dr. Scott Stuart. Stuart conducted a one-and-a-half hour interview with Decker, examined his medical records, and reviewed police reports about the events of August 24. The doctor concluded that at the time of the attack, Decker was suffering from untreated schizophrenia. As a result, the defendant was unaware of the nature and consequences of his actions, and unable to distinguish between right and wrong. In support of his opinion, Stuart noted that Decker called out to people that were not there. In particular,

Stuart noted that Decker called out to "Ted," who was not at the scene of the crime, and had various conflicting versions about Ted's involvement. Stuart concluded that Ted was part of Decker's delusional system. Relying on police reports that Decker was "not [all] there," Stuart concluded that at the time of the crime he was in the midst of an untreated psychotic episode, consistent with untreated schizophrenia.

In addition to the direct testimony of Blome and Stuart, Decker offered into evidence medical records regarding his mental health. The records generally reveal a long history of treatment for psychological and behavioral matters. The diagnoses fluctuated from childhood behavior disorder, childhood schizophrenia, mild mental retardation, unsocialized aggressive reaction disorder, and attention deficit disorder.

On rebuttal, the State called Detective Deutmeyer to the stand. Deutmeyer was asked about her observations of Decker's demeanor at the time of his interrogation. Deutmeyer testified that "he didn't want to make eye contact with me, he was very evasive." Decker's counsel objected to the characterization that Decker did not want to make eye contact, asking the court to direct the witness to recast the testimony to simply state that Decker did not make eye contact with her. The district court overruled the objection. Deutmeyer further testified, without defense objection, "As I was speaking with him, he continually looked at the floor. He was kind of fidgety. That was about it."

At this point, the State offered into evidence the entire videotape of Decker's police interrogation. The State recognized that the tape been had suppressed during its case-in-chief, but contended that the defense had opened the door by asserting an insanity defense. Specifically, the State alleged that the tape would show the defendant's "capacity" or demeanor

shortly after the incident. The State further argued that the tape provided better evidence of Decker's capacity than Detective Deutmeyer's testimony. Finally, the State argued that the tape did not contain any statements that would be regarded as incriminating in any event.

Decker's attorney objected to the offer of the videotape. The defense argued that the tape should not be admitted in light of the suppression ruling. Defense counsel conceded that the statements were made close in time and proximity, but questioned whether any arguably relevant aspects of the tape could be separated from unlawfully obtained evidence. According to defense counsel, "I don't believe there is any way that . . . the court could be able to look at the tape and observe for demeanor and so forth and not listen to what is said on the tape." The district court overruled Decker's objection and admitted the interrogation videotape.

After the videotape was admitted, Deutmeyer continued her testimony. She testified that she did not know whether Decker understood her questions, but that she had to ask him questions several times before she got an answer. In terms of speech and demeanor, she testified, "He just seemed like he had a lot on his mind and wasn't really there."

The State also called Candice Martin, a friend of McNeal, as a rebuttal witness. She testified that she observed Decker a couple of times a week prior to the incident leading to his arrest. She testified that she had not observed Decker engage in any unusual or bizarre behavior.

The State's final witness on rebuttal was Ted Dunkel, who was located by McNeal's family on the third day of trial. Dunkel testified that he gave Decker a ride in his van to the area surrounding McNeal's home on the date of the incident and that Decker instructed him to wait in the van. After waiting for more than half an hour, Dunkel left the keys in the van

and walked to work. According to Dunkel, Decker appeared "fine," "normal," "not angry," and "quiet."

In response, the defense recalled Dr. Stuart. Dr. Stuart reconfirmed his prior diagnosis, despite "Ted's" discovery.

In her ruling, Judge Beckelman rejected Decker's insanity defense and found Decker guilty as charged. With respect to insanity, Judge Beckelman noted that while Dr. Stuart supported his opinion by pointing to auditory hallucinations with a nonexistent "Ted," when the crime was committed the evidence showed that Ted, in fact, was quite real and in the immediate vicinity.

Contrary to Dr. Stuart, Judge Beckelman noted that the medical records, at least from 1976 to the present, tended to support the absence of ongoing auditory or visual hallucinations, psychotic symptoms, and delusional thinking. As a result, she disagreed with the opinion of Dr. Stuart that Decker had a long and clearly documented history of paranoid delusions. Instead, she found that claims of Decker's hallucinations were self-reported only after his arrest. Further, review of the medical records drove Judge Beckelman to the opposite conclusion, namely, that Decker was of sufficient intelligence and mental capacity to form specific intent.

Aside from the medical evidence, Judge Beckelman also relied upon the testimony of lay witnesses. She observed that McNeal and Martin, both of whom had ample opportunity to observe Decker prior to the crime, testified that he behaved in a normal fashion.

Finally, Judge Beckelman cited the facts surrounding the attack. She concluded that the evidence showed that Decker purposefully planned and carried out the attack in revenge for the breakup of his relationship. Judge

Beckelman found that Decker perpetrated the crime through deliberate, logical, and methodical steps.

Subsequent to his conviction, Judge Beckelman sentenced Decker to twenty-five years on both the attempted murder and burglary counts and to ten years on the willful injury count. Additionally, the court ordered that each of these sentences run consecutively, for a total of sixty years. Decker filed a timely notice of appeal.

## II.  Standard of Review.

Decker alleges that the admission of the interrogation video violated his right to due process by compelling him to be a witness against himself in violation of Article I, section 9 of the Iowa Constitution and the Fifth and Fourteenth Amendments to the United States Constitution. We review constitutional claims de novo. *State v. Piper*, 663 N.W.2d 894, 901 (Iowa 2003).

## III.  Preservation of Error.

The State argues that Decker has failed to preserve error on his constitutional claim, citing: (1) Decker's failure to object to either the calling of Detective Deutmeyer as a rebuttal witness or to her testimony regarding Decker's interrogation demeanor; and (2) Decker's failure to articulate the constitutional basis for his objection at trial.

Although the State is certainly correct that the detective introduced demeanor evidence without objection prior to the videotape's introduction, we do not find this omission fatal. As will be discussed below, the demeanor evidence elicited before the tape's introduction was permissible, physical demeanor evidence. The videotape, however, contains impermissible evidence—namely Decker's repeated invocations of his right to remain silent and testimonial demeanor evidence. Decker did interpose a

timely objection to the offer of the videotape and, as a result, the objection was timely with respect to this evidence.

Secondarily, the State argues that Decker's objection to the admission of the videotape was too general to preserve error. The general rule with respect to error preservation is that unless the reasons for an objection are obvious a party attempting to exclude evidence has the duty to indicate the specific grounds to the court so as to alert the judge to the question raised and enable opposing counsel to take proper corrective measures to remedy the defect, if possible. *State v. Clay*, 213 N.W.2d 473, 476–77 (Iowa 1973). Although Decker's counsel failed to state his objection with particularity, counsel repeatedly referenced the prior suppression ruling which held that the interrogation was inadmissible for *Miranda* violations and promises of leniency. Under this record, both the State and the court were informed of the underlying nature of the objection through incorporation of the grounds previously raised by the defense. As a result, error is preserved.

**IV. Discussion.**

**A. Issues Presented on Appeal.** Decker asserts that the trial court erred in admitting the videotaped interrogation in violation of his Fifth Amendment rights as incorporated against the State through the Due Process Clause of the United States Constitution and through the parallel provision in the Iowa Constitution.[1] The State does not appeal the original suppression order, but asserts that the video was proper rebuttal evidence to show Decker's demeanor less then twenty-four hours after his attack on

---

[1]While Decker argues that the admission of the interrogation tape violated both state and federal constitutional provisions, he has failed to articulate any ground on which to treat or interpret the clauses differently. As such, the state constitutional ground will not be analyzed separately. *See Pfister v. Iowa Dist. Ct.*, 688 N.W.2d 790, 795 (Iowa 2004) ("Because the parties have articulated no basis for distinguishing these clauses for purposes of determining a parolee's right to counsel, our discussion of the federal due process claim applies equally to the claim made under the Iowa Constitution.").

McNeal.  According to the State, this evidence of Decker's demeanor tends to show that Decker was not delusional at the time the crime was committed.

The entire videotape of Decker's interrogation was admitted into evidence for the purpose of showing Decker's "demeanor."  The admission of the videotape in its *entirety* gives rise to several constitutional issues.

First, by offering the entire tape into evidence, the State included portions of the videotape where Decker asserted his *Miranda* rights.  The question arises whether these portions of the videotape, which arguably demonstrate that the defendant is capable of rational and calculated behavior, were admissible and, if not, whether their admission requires reversal.  Second, the videotape contains testimonial demeanor evidence elicited after Deutmeyer refused to honor Decker's *Miranda* rights and after she made, according to the suppression ruling, an unlawful promise of leniency.  The question arises whether the admission into evidence of testimonial demeanor evidence *after* these infractions was permissible and, if not, whether the admission requires reversal.

**B.  Admissibility of Testimony Showing Invocation of and Exercise of *Miranda* Rights.**  Over twenty years ago, the United States Supreme Court in *Wainwright v. Greenfield*, 474 U.S. 284, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986), held that due process prohibited the use of a defendant's invocation of *Miranda* rights as evidence of his sanity. Expanding upon its decision in *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), the Court noted that it would be fundamentally unfair to assure a suspect that his silence would not be used against him and then later renege on that promise to attack his proffered defense. *Wainwright*, 474 U.S. at 292, 106 S. Ct. at 639, 88 L. Ed. 2d at 630–31.  In

so ruling, the Court emphasized that "silence does not mean only muteness; it includes the statement of a desire to remain silent, as well as a desire to remain silent until an attorney has been consulted." *Id.* at 295 n.13, 106 S. Ct. at 640 n.13, 88 L. Ed. 2d at 63 n.13. In the videotape offered in this case, Decker asserted his right to remain silent at least five times and did indeed remain silent for a considerable period of time. Under *Greenfield*, this evidence is not admissible to show lack of sanity.

**C. Admissibility of Demeanor Evidence Obtained After *Miranda* Violations and Unlawful Offer of Leniency.** It is axiomatic that only evidence that is testimonial in nature is protected by the Fifth Amendment. Nontestimonial evidence thus is unprotected and unaffected by *Miranda* and Fifth Amendment violations. "[I]n order to be considered testimonial, an accused's communication must itself, explicitly or implicitly, relate to a factual assertion or disclose information." *Doe v. United States*, 487 U.S. 201, 210, 108 S. Ct. 2341, 2347, 101 L. Ed. 2d 184, 197 (1988).

Some evidence obtained through a defendant's arrest is clearly nontestimonial. For example, compelling an arrested suspect to submit to fingerprinting, photographing, or other physical measurements, to write or speak for identification, to stand, walk, or make a particular gesture, or to submit to a blood test does not result in the gathering of testimonial evidence. *Schmerber v. State*, 384 U.S. 757, 764, 86 S. Ct. 1826, 1832, 16 L. Ed. 2d 908, 916 (1966).

The line between testimonial and nontestimonial evidence is more difficult to draw, however, when the evidence is obtained in response to a police interrogation. In *Pennsylvania v. Muniz*, 496 U.S. 582, 110 S. Ct. 2638, 110 L. Ed. 2d 528 (1990), the United States Supreme Court held that "any slurring of speech and other evidence of lack of muscular coordination"

in response to direct questioning "constitute nontestimonial components of those responses." *Muniz*, 496 U.S. at 592, 110 S. Ct. at 2645, 110 L. Ed. 2d at 546. Slurring and lack of muscular coordination relate, of course, to *physical* rather than *communicative* acts or responses.

At the same time, the Supreme Court in *Muniz* rejected the argument that inferring the physiological function of an accused's brain from his statements was nontestimonial. *Id.* at 593, 110 S. Ct. at 2646, 110 L. Ed. 2d at 546. According to the court, the question is "whether the incriminating inference of mental confusion is drawn from a testimonial act or from physical evidence." *Id.* Because the inference of confusion arose from the *content* of the accused's statements and not from a purely physical response, the inference was impermissible as arising from a testimonial act. *See Miller v. Dugger*, 838 F.2d 1530, 1542 (11th Cir. 1988) ("The psychiatrist based his diagnosis not just on Cape's demeanor and the sound of Cape's voice, but on the contents and substance of Cape's answers to his questions, 'thus making Cape's communications to him testimonial in nature.'" (quoting *Cape v. Francis*, 741 F.2d 1287, 1294 (11th Cir. 1984), *cert. denied*, 474 U.S. 911, 106 S. Ct. 281, 88 L. Ed. 2d 245 (1985))).

Drawing on *Muniz*, it appears that Decker's fidgeting and slow speech pattern amount to nontestimonial evidence. On the other hand, any evidence related to the quality or content of his communication is testimonial and protected by Fifth Amendment privileges. To the extent the videotape contains communicative responses after Decker asserted his *Miranda* rights or the promise of leniency was made, including his ability to "track" or understand the conversation, it is inadmissible.

**D. Application of Principles.** Under the applicable case law, the nontestimonial evidence contained on the videotape, such as fidgeting,

staring at the ground, the physical quality of his speech, and the lack of any involuntary hallucinations, would be admissible demeanor evidence notwithstanding the constitutional violations. *Muniz*, 496 U.S. at 592, 110 S. Ct. at 2645, 110 L. Ed. 2d at 546. Portions of the videotape, therefore, were properly admitted into evidence.

The problem, as stated by the defense, however, is that to the extent the tape contains any nontestimonial demeanor evidence, it is intertwined with impermissible evidence. In viewing the tape, the district court would be required to ignore Decker's repeated attempts to exercise his *Miranda* rights, ignore the communicative content of Decker's testimonial statements, and focus solely on the physical aspects of Decker's demeanor.

Decker argues that it would be extremely difficult for the finder of fact to separate out the permissible from the impermissible evidence, requiring reversal of his convictions. If this case were tried to a jury, Decker would have a strong argument. Before a jury, the limited probative value of the admissible features of the videotape would in all likelihood be outweighed by its prejudicial effect. Even with limiting instructions, it would be difficult for an untrained jury to consider only the physical demeanor evidence and not consider the fact that the videotape showed Decker invoking his *Miranda* rights and not consider the communicative content of his statements. *See Robinette v. State*, 741 N.E.2d 1162 (Ind. 2001) (holding that a trial court's limiting instruction could not cure the wrongful admission of *Miranda* invocations in a jury trial).

Here, however, trial was to the court. Judges routinely are called upon to consider the admissibility of evidence that may be later excluded at trial. Judicial knowledge of evidence which is subsequently not admissible does not ordinarily undermine later judicial determinations in the case. *See*

*State v. Matheson*, 684 N.W.2d 243, 244 (Iowa 2004) (noting that "legal training helps equip those in the profession to remain unaffected by matters that should not influence the determination").

The impermissible portions of the videotape, moreover, were not admitted into evidence. The record in this case demonstrates that the State was not offering the videotape to establish the truth of any assertions made by Decker or to show that Decker was rational enough to invoke his Fifth Amendment rights. Instead, the State asserted that the videotape was admissible for the limited purpose of allowing the court to "see the defendant and observe his demeanor." While the district court simply admitted the videotape without further comment, in context, it is clear that the evidence was offered and admitted for the limited purpose of showing Decker's demeanor.

Our rules of evidence allow evidence to be admitted for a limited purpose even though that same evidence is inadmissible for another purpose. Iowa R. Evid. 5.105. When admissibility is limited, the court "restrict[s] the evidence to its proper scope and instruct[s] the jury accordingly." *Id.* When the case is tried to the court, however, we assume that the court considered the tape solely for the limited purpose for which it was offered. Here, the videotape was admitted for the limited purpose of demonstrating Decker's demeanor. The mere fact that the tape also collaterally contained his *Miranda* invocations and testimonial demeanor evidence, thus did not make the tape wholly inadmissible.

There is no indication in the court's decision, moreover, that it considered the impermissible evidence—either the *Miranda* invocations or the testimonial demeanor evidence—in reaching its decision. Although Judge Beckelman referred to the professional and lay demeanor evidence

elicited at trial, she made no mention of the videotape or *any* of the evidence contained therein. *See State v. Sailer*, 587 N.W.2d 756 (Iowa 1998) (holding that the reviewing court places "great confidence" in judges to follow the law and will not assume that evidence in a sentencing hearing was considered for an improper purpose without a clear showing); *In re O'Hara's Estate*, 204 Iowa 1331, 217 N.W. 245 (1928) (holding that in a bench trial the appellate court presumes that the final judgment was based solely upon competent evidence and that impermissible evidence was disregarded).

Nothing in *Matheson* is to the contrary. In *Matheson*, the district court in a sentencing proceeding admitted into evidence a victim impact statement related to an out-of-state crime. 684 N.W.2d at 244. The evidence offered and admitted in Matheson's sentencing proceeding was not admissible for *any* purpose. *Id.* Further, the improperly admitted evidence in *Matheson* contained substantial information not available from any other source. *Id.* at 245. Because the district court in *Matheson* did not affirmatively indicate that the harmful evidence was not considered, we vacated the resulting sentence and remanded the case for resentencing before a different judge. *Id.*

Here, as in *Matheson*, the district court order did not mention the challenged evidence in reaching its decision and instead relied upon other evidence in concluding that Decker was sane at the time of the crime. Unlike *Matheson*, however, the challenged evidence was offered and admitted for a *valid* limited purpose—physical demeanor evidence. Decker did not below and does not now question that demeanor evidence would be at least of *some* relevance on the issue of sanity. Because the tape had a permissive evidentiary purpose, its admission was not per se in error. Moreover, without at least some indication that the district court considered

the tape's impermissible evidence, Decker has not demonstrated that his right to due process has been violated.

### V. Conclusion.

Although it is clear that the police interrogation video contained permissible and impermissible evidence, its admission did not amount to constitutional error as (1) the district court properly restricted the tape's admission for demeanor evidence only; and (2) there is no indication that the court thereafter considered the videotape for an improper purpose. For the above reasons, the decision of the district court in this case is affirmed.

**AFFIRMED.**