# IN THE COURT OF APPEALS OF IOWA

No. 21-1617
Filed March 8, 2023

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**ROBERT PAUL KROGMANN,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Delaware County, Linda M. Fangman, Judge.

Robert Krogmann appeals his convictions for attempted murder and willful injury causing serious injury. **REVERSED AND REMANDED FOR NEW TRIAL.**

Jamie L. Hunter and Angela Campbell of Dickey, Campbell, & Sahag Law Firm, PLC, Des Moines, for appellant.

Brenna Bird, Attorney General, and Martha E. Trout, Assistant Attorney General, for appellee.

Heard by Greer, P.J., Chicchelly, J., and Gamble, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2023).

**GAMBLE, Senior Judge.**

Robert Krogmann appeals following his convictions for attempted murder and willful injury causing serious injury. We reverse and remand for a new trial.

**I. Background Facts and Prior Proceedings**

Krogmann and J.S. began a relationship in 2007. But they broke up in January 2009. Then J.S. reached out to Krogmann to get a small kitchen appliance back from him; they got back together. But things were not the same, instead they were tense. J.S. discovered Krogmann was communicating with women on Match.com, so she ended their relationship. Krogmann wanted her back and would call her fifty times a day for "days on end." He even showed up at her house unannounced while she was gone, and J.S.'s brother, Michael, had to convince Krogmann to leave. But J.S. never felt like Krogmann was a danger, and she even went to visit him at his house after they broke up.

Around this same time, Krogmann's family became increasingly concerned about him. His older brother always had concerns about Krogmann's mental health, but he believed Krogmann's mental health was declining even further. Krogmann's sister-in-law thought Krogmann's mental health was the worst she had ever seen it and that Krogmann was fixated on J.S. Krogmann had told his mother he wanted to go to J.S.'s house and kill himself there. His son, Jeff, believed Krogmann was suicidal, so he took Krogmann's long guns away from him on March 11.

This all led up to March 13. J.S. was having a "lazy morning, drinking coffee" because she was off of work that week. Then Krogmann showed up at J.S.'s house. He asked to come inside, and J.S. let him in. He asked if they could

get back together; she said no. He responded by asking for a hug, and she obliged. J.S. turned around to get her cup of coffee and when she turned back around, Krogmann was pointing a handgun at her.

J.S. asked Krogmann if he was going to shoot her, he replied that they were both going to die together and "[i]f he couldn't have [her], then no one was gonna." Then he shot her, but she couldn't feel anything. He said "he didn't want to spend the rest of his life in jail and he was gonna finish it and then he shot again." "[H]e said he was gonna kill [her] and then was gonna shoot himself." J.S. asked him to call 911, but he said he could not because he purposefully left his phone in the car so he would not be able to call for help.

Krogmann shot J.S. a third time, and the bullet went through her spine, causing her to fall immediately. She asked him to get her pillow and a rosary. The two said a prayer together before Krogmann remarked he didn't think it would take her that long to die.

Eventually, Krogmann retrieved J.S.'s phone and called Jeff to say he shot J.S. and Jeff needed to call 911 right away. Jeff left work for J.S.'s house and called 911. As some point, Krogmann also called 911 and informed dispatch that "someone had been shot." Meanwhile, Krogmann let J.S. call her mother. She told her mother that she loved her and asked her mother to tell her father and daughters that she loved them, and then she asked her mom to call Michael. Krogmann responded by ending the phone call and turning off her phone. Meanwhile, J.S.'s mother called Michael and told him to get to J.S.'s home as fast as he could.

Jeff showed up and took the gun away from Krogmann. Michael arrived just after Jeff and chased Krogmann out of the house with a broom. Krogmann and Jeff left while Michael stayed with J.S.

Emergency personnel took J.S. to a regional medical center so she could be airlifted to the University of Iowa Hospital, where she remained for three weeks. She underwent multiple surgeries. As a result of her injuries, she has no strength in one of her hands, walks with a cane due to a lack of feeling in her feet, and wears a brace on her leg from the knee down because her ankle "doesn't work at all." She is in constant pain every day.

As for Krogmann, officers followed Jeff to Krogmann's house and took Krogmann into custody as he headed back home. Once in custody, Jack Liao, a special agent with the Iowa Division of Criminal Investigation, was assigned to interview Krogmann. That interview was videotaped. Special Agent Liao found Krogmann seated in a restraint chair that restrained his arms and legs. Special Agent Liao asked for the arm restraints to be removed because he would not normally interview suspects in restraint chairs. A deputy loosened the restraints on Krogmann's arms and later his hands, but Krogmann remained restrained in the chair by his legs. At the beginning of the interview Krogmann began by asking if J.S. was okay. Then Krogmann went over what happened at J.S.'s home that morning. He admitted shooting J.S. At times during the interview Krogmann talked very softly or in a whisper. And sometimes there were long pauses in between Special Agent Liao's questions and Krogmann's answers.

The State charged Krogmann with attempted murder and willful injury causing serious injury. The jury in his first trial found Krogmann guilty of both

counts. Krogmann appealed, and the supreme court affirmed his convictions. *State v. Krogmann*, 804 N.W.2d 518, 520 (Iowa 2011). Then he sought postconviction relief (PCR), which the PCR court denied. This court affirmed the PCR court. *Krogmann v. State*, No. 15-0772, 2017 WL 363226, at *10 (Iowa Ct. App. Jan. 25, 2017). However, the supreme court granted further review, found structural error, and granted Krogmann a new trial. *Krogmann v. State*, 914 N.W.2d 293, 318–25 (Iowa 2018).

Krogmann filed notice of his intent to rely on the defense of diminished capacity on retrial. The State filed a motion in limine seeking to exclude, among other things, "[a]ny out of court statements made by the defendant that are offered by the defendant at trial and not subject to an exception." Krogmann resisted.[1] Krogmann explained the video of Special Agent Liao's interview of him would contain his out-of-court statements but could be offered for purposes other than to prove the truth of the matter asserted like to demonstrate his mental and emotional state and his ability to follow the conversation around the time of the shooting. Following a hearing on the parties' motions in limine, the court determined Krogmann's out-of-court statements were

> [g]enerally . . . considered hearsay by [Iowa] Rule of Evidence 5.801(d)(2)(A) as well as *State v. Veal*, 564 N.W.2d 797, 808 (Iowa 1997). However, an exception to those general rules may be applicable. As such, [that portion] of the State's motion in limine is sustained unless and until a proper foundation is laid for an exception.

It filed an additional order specifically addressing Krogmann's ability to introduce the video of Special Agent Liao's interview with Krogmann—exhibit A. The court

---

[1] Krogmann also filed a motion in limine.

determined exhibit A would not be admissible because it amounted to hearsay without an exception and Krogmann could not offer his own out-of-court statements under *Veal*, 564 N.W.2d at 808.

The case proceeded to a jury trial. The parties presented numerous witnesses, including respective expert witnesses who testified as to Krogmann's ability to form specific intent. Special Agent Liao testified. During his testimony, he noted his entire interview with Krogmann was recorded. In response, Krogmann made an offer of proof for exhibit A. Counsel explained:

> So we think that Mr. Liao's testimony has opened the door to offering that exhibit. It is the best evidence of what the substance of Mr. Liao's testimony was. It shows Mr. Krogmann's demeanor. It shows time frames. It shows how many times and how he was being questioned and the State did elicit testimony from Mr. Liao about what was going on in the interview. They were asked about—he was asked, did he seem to track and understand; was he following the conversation; was this a normal conversation; were these—this was not unusual. There was nothing unusual about the interview. And I think that the video itself actually shows the opposite, Your Honor. It shows the demeanor of the defendant as being confused at times, not responsive at times. There's long pauses. He's talking so softly, it's not a normal conversation. It's not just someone speaking softly, it is something different. It is showing, we think, the demeanor of the defendant and the current mental state of the defendant at that particular time.
> So because—the officer is also shown a transcript, an unofficial transcript of the recording by the State and the best evidence of that interview is simply the actual interview. So we would offer Exhibit A as a court's exhibit for an offer of proof.

The court reaffirmed its pre-trial rulings on exhibit A and found Special Agent Liao's testimony did not open the door to the video.

Following deliberations, the jury returned guilty verdicts on both counts. Krogmann filed motions in arrest of judgment and for new trial, which the district court denied.

Krogmann appeals.

## II. Discussion

### A. Sufficiency of the Evidence[2]

We review Krogmann's challenge to the sufficiency of the evidence for corrections of errors at law. *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012). Guilty verdicts must be supported by substantial evidence, which is "that upon which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *State v. Serrato*, 787 N.W.2d 462, 465 (Iowa 2010) (citation omitted). While we consider all evidence, we view it in the light most favorable to the State. *Id.* So "[e]vidence is not insubstantial merely because we may draw different conclusions from it; the ultimate question is whether it supports the finding actually made, not whether the evidence would support a different finding." *State v. Lacey*, 968 N.W.2d 792, 800–01 (Iowa 2021) (citation omitted).

Krogmann appears to only challenge the sufficiency of the evidence establishing his specific intent to kill J.S. with respect to his attempted-murder conviction. The marshalling instruction[3] for attempted murder required the jury to find the following three elements satisfied:

---

[2] Section V of Krogmann's appellate brief argues the evidence at trial was insufficient to support his convictions and the weight of the evidence did not support his convictions. These are two distinct inquires, and only the former implicates double jeopardy. *See State v. Ellis*, 578 N.W.2d 655, 659 (Iowa 1998). Because success on the sufficiency challenge would require us to remand for judgment of acquittal and end our inquiry, we start with that issue and bifurcate the two claims raised in section V of Krogmann's appellate brief. Because we conclude Krogmann is entitled to new trial on an evidentiary issue, we do not reach his weight-of-the-evidence challenge.

[3] Krogmann did not object to instruction eighteen, the marshalling instruction. "Where, as here, the jury was instructed without objection, the jury instructions

> 1. On or about March 13, 2009, the defendant shot [J.S.]
> 2. By his acts, the defendant expected to set in motion a force or chain of events which would cause or result in the death of [J.S.]
> 3. When the defendant acted, he specifically intended to cause the death of [J.S.]

Krogmann asserts he could not have had the specific intent to kill J.S. because, even if he was capable of forming such specific intent, the evidence establishes he had additional ammunition in his revolver but chose not to shoot J.S. again and he sought out help for J.S.—contradicting a finding that he intended to kill J.S. We disagree. J.S. testified Krogmann made several statements about intending to kill her as he shot her three times at close range with a high-caliber handgun. He left his phone in his vehicle during the shooting so he wouldn't be tempted to call for help. Viewing this evidence in the light most favorable to the State, we conclude the State established sufficient evidence Krogmann specifically intended to cause the death of J.S. when he shot her three times.

**B. Exhibit A**

We move on to consider the admissibility of exhibit A. We generally review evidentiary rulings for an abuse of discretion. *Powers v. State*, 911 N.W.2d 774, 780 (Iowa 2018). "An abuse of discretion occurs when the trial court exercises its discretion 'on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *State v. Rodriquez*, 636 N.W.2d 234, 239 (Iowa 2001) (citation omitted). However, "[w]e review evidentiary rulings on hearsay for errors at law." *State v. Skahill*, 966 N.W.2d 1, 8 (Iowa 2021).

---

become the law of the case for the purposes of reviewing the sufficiency of the evidence." *State v. Banes*, 910 N.W.2d 634, 639 (Iowa Ct. App. 2018).

Krogmann's challenge to the court's exclusion of exhibit A is persuasive on two fronts: the video did not amount to hearsay and it should have been admitted under the best evidence rule.[4]

Hearsay is an out-of-court statement offered "into evidence to prove the truth of the matter asserted in the statement." Iowa R. Evid. 5.801(c). A statement can be an oral or written assertion or even nonverbal conduct if intended as an assertion.[5] Iowa R. Evid. 5.801(a). Hearsay is not admissible unless an exception applies. *See* Iowa R. Evid. 5.802. However, we need not consider whether a hearsay exception applies when evidence "is not offered to show the truth of the matter asserted" because it is not hearsay. *State v. Plain*, 898 N.W.2d 801, 812 (Iowa 2017).

We do not just blindly accept an offering party's explanation that proposed evidence would not be used for the truth of the matter asserted. *See State v. Hollins*, 396 N.W.2d 701, 705 (Iowa 1986). "Rather, we review the relevant record to determine if the purpose voiced by the [offering party] can reasonably be found to be the real purpose for which the challenged testimony was offered." *Id.* "For us to conclude the [the offering party]'s purpose in offering challenged [evidence]

---

[4] Krogmann argues Special Agent Liao's testimony "opened the door" to the admissibility of the video under the rule of completeness. Indeed, our supreme court has recognized, "[T]he rule of completeness in Iowa Rule of Evidence 5.106 might be characterized as posing an open-the-door concept." *State v. Huser*, 894 N.W.2d 472, 507 (Iowa 2017). However, while Krogmann mentioned that the State "opened the door to offering" the video in his argument to the district court, he did not raise the rule of completeness at the trial that he now asserts on appeal, so we decline to address it. *See Meier v. Senecaut*, 641 N.W.2d 352 (Iowa 2002).

[5] Nonverbal conduct amounts to a statement when it conveys information; for example, if someone acts out prior events to explain what happened to them, that amounts to a nonverbal assertion or statement. *See State v. Dessinger*, 958 N.W.2d 590, 599 (Iowa 2021).

was in fact to explain" or demonstrate some responsive conduct or behavior, "that conduct [or behavior] must itself be relevant to some aspect of the [offering party]'s case." *Id.* at 705–06. If the challenged evidence is relevant to the offering party's case only if the statements contained in the challenged evidence are accepted as true, then the challenged evidence is actually being offered for the truth of the matter asserted, amounting to inadmissible hearsay unless some hearsay exception applies. *Id.* at 706.

With that in mind, we turn to Krogmann's desired use of exhibit A. The State contends the real reason for Krogmann's offer of the video was to put his out-of-court statements in front of the jury without cross-examination. The State posits he sought to prove the truth of his statements under the guise of seeking sympathy for his mental illness. So, according to the State, Krogmann's statements are hearsay and no exception applies. But the State's argument is unpersuasive. The substance of Krogmann's statements is inculpatory. He confesses to shooting J.S. and goes along with many of Special Agent Liao's questions. And at oral argument, the State had difficulty identifying a statement that Krogmann offered to prove the truth of the matter asserted.

Krogmann makes it clear that he did not want to admit the video for the purpose of introducing his out-of-court statements. Certainly, if he sought to admit his verbal statements made in the video those would amount to hearsay. But the real reason Krogmann sought to introduce the video was to show his demeanor during the interview to demonstrate his mental instability on the day of the shooting. And Krogmann's mental instability is at the heart of his defense.

Krogmann's demeanor during the interview was hotly contested. Special Agent Liao testified on direct examination that Krogmann was able to track, understand, and follow the conversation. He could comprehend and stay on topic. He was responsive and volunteered information. He was not intoxicated or impaired by drugs. Special Agent Liao agreed on cross-examination that Krogmann was talking quietly and whispering at times, there were long pauses, and it was not a quick conversation. But he also testified it was not a fluid conversation and it seemed Krogmann was "cognizantly thinking of almost a short answer as opposed to a normal conversation." Krogmann's conduct on the video was relevant to establish his mental instability regardless of whether the statements made in the video are considered as true. *See id.*

We conclude Krogmann really did seek to admit the video for a purpose other than to introduce the statements in the video for their truth. Instead, Krogmann offered the video as evidence of his diminished capacity. The State's expert formed his opinion that Krogmann had the capacity to form specific intent without even watching the video. But Krogmann's expert found the video of Krogmann writhing around in his chair, panting, not looking at the officer, covering his face, and looking away to be informative in coming to her opinion that Krogmann lacked capacity to form specific intent. From the video, the jury would have been able to observe his conduct, demeanor, and ability to follow a conversation. None of that amounts to hearsay. And contrary to the State's position, his nonverbal conduct did not amount to out-of-court statements because his conduct was not intended to convey information—rather it is merely indicative of his state of mind on the day of the shooting. *See Dessinger*, 958 N.W.2d at 599.

In addition to misclassifying the evidence sought to be admitted as hearsay, the district court was also misguided in relying on *Veal*. 564 N.W.2d at 808–09. In *Veal*, the defendant sought to admit her own out-of-court statements. *Id.* at 808. Specifically, Veal attempted to admit her *statements* under the excited utterance exception, as statements by a party opponent, and statements against her interest.[6] *Id.* at 808–09. But *Veal* is inapplicable to the present case because Krogmann is not attempting to introduce his out-of-court *statements* like the defendant in *Veal*. Instead, he is attempting to introduce his *conduct and behavior* following the shooting to demonstrate his state of mind. So we think the district court missed the mark by excluding exhibit A under *Veal*.

Instead, we think the present case is more akin to *State v. Decker*, 744 N.W.2d 346, 356 (Iowa 2008), which addressed the admissibility of an interrogation video wherein permissible and impermissible evidence were intertwined. In *Decker*, the court permitted the State to introduce the video "for the limited purpose of allowing the court to 'see the defendant and observe his demeanor.'" 744 N.W.2d at 356. That is what Krogmann sought to do. "Our rules of evidence allow evidence to be admitted for a limited purpose even though that same evidence is inadmissible for another purpose." *Id.* "When admissibility is limited, the court 'restrict[s] the evidence to its proper scope and instruct[s] the jury

---

[6] Veal also raised a constitutional claim based on the Iowa and federal Constitutions, claiming her right to present a defense was impinged. *Veal*, 564 N.W.2d at 809. The supreme court concluded there were no constitutional implications because the proposed evidence did not reach the heart of the case and "a reasonable jury could not have reached a different verdict based on the statements Veal sought to introduce." *Id.*

accordingly.'" *Id.* (alterations in original) (quoting Iowa R. Evid. 5.105). There is no reason that could not have happened here.

We are cognizant that *Decker* was a bench trial, while Krogmann had a jury trial, and *Decker* warned of the potential danger of prejudice even with a limiting instruction in jury trials. *See id.* But we do not have that concern under these facts because Krogmann has already admitted to the most prejudicial and incriminating fact—he admits to shooting J.S. And the specifics of Krogmann's statements in the video are almost indiscernible because he speaks so softly during the interview.

We also think after the State elicited testimony from Special Agent Liao about his interview with Krogmann the "best evidence" rule required admission of exhibit A. "The 'Best Evidence' rule requires production of original documents unless their absence is sufficiently explained." *State v. Khalsa*, 542 N.W.2d 263, 268 (Iowa 1995). The purpose of the best evidence rule is to secure the most reliable information as to the contents of documents when those terms are disputed. *Id.* So "[w]hen a party is attempting to prove the contents of a writing, recording, or photograph, the courts require the original to be produced, unless it falls under exceptions carved out by the Iowa Rules of Evidence." *Id.* Here there is a slight nuance, the content of the recording sought to be proven isn't the terms of the conversation between Krogmann and Special Agent Liao but instead how Krogmann was acting during the conversation.

The State and Krogmann largely disagreed as to how Krogmann acted during the interview, making the best evidence rule applicable. *See id.* (concluding the best evidence rule did not apply when the defendant objected to the

introduction of transcripts of properly admitted audiotapes but did not contest the reliability or accuracy of the transcripts). And the video showing Krogmann during the interview is the best evidence.

Special Agent Liao watched the video of the interview within forty-eight hours before he testified. He had a difficult time remembering the details of the interview, which is understandable considering more than twelve years had passed. Nevertheless, Special Agent Liao testified to his impressions of how Krogmann acted during the conversation. And Krogmann's expert described what she saw on the video. Her description of Krogmann's conduct was different from Special Agent Liao's. But any uncertainty as to what transpired during the interview could have been put to bed by admitting exhibit A. As the old saying goes, "A picture is worth a thousand words, although here, we have a video—a series of pictures." *Ransdell v. Huckleberry Ent., LLC*, No. 19-0545, 2020 WL 5650728, at *1 (Iowa Ct. App. Sept. 23, 2020). "A video is often the best evidence of the [event] as opposed to someone describing it." *Id.* at *7. Likewise, the video here is the best evidence of Krogmann's conduct and demeanor right after the shooting rather than having Special Agent Liao and the expert describe it. *See State v. Williams*, 197 N.W. 991, 994 (Iowa 1924) ("The photographs themselves were the best evidence of what they showed."). The jury should have been allowed to see the video.

Taking all of this into consideration, we conclude the court erred in excluding exhibit A as hearsay and abused its discretion in excluding it on other grounds. *See State v. Dudley*, 856 N.W.2d 668, 675 (Iowa 2014) (recognizing hearsay challenges are reviewed for legal error and all other evidentiary challenges are

reviewed for an abuse of discretion).  Now we must determine whether exclusion of exhibit A was harmless.  "Reversal is required for evidentiary error when 'the error affects a substantial right of the party.'"  *State v. Montgomery*, 966 N.W.2d 641, 661 (Iowa 2021) (quoting Iowa R. Evid. 5.103(a)).  "We presume the defendant's rights have been prejudiced unless the State can affirmatively establish otherwise.  The State overcomes the presumption of prejudice if it can establish that there was overwhelming evidence of the defendant's guilt."  *Id.* (citation omitted).  Here, exhibit A goes to the heart of Krogmann's defense of diminished responsibility.  And the parties elicited conflicting expert testimony as to Krogmann's ability to form specific intent.  So we conclude the exclusion of exhibit A was not harmless and retrial is necessary.  However, we caution that exhibit A should not be admitted without jury instructions limiting the scope of the jury's consideration of the exhibit.[7]

### C. Remaining Claims

"Because we find the case must be remanded for a new trial, we will consider any remaining issues that may arise again on retrial."  *Zaw v. Birusingh*, 974 N.W.2d 140, 168 (Iowa Ct. App. 2021) (quoting *Kinseth v. Weil-McLain*, 913 N.W.2d 55, 73 (Iowa 2018)).  As for Krogmann's numerous remaining claims, we only address Krogmann's claim that his convictions should merge.

---

[7] A limiting instruction is an important tool for the district court to utilize to minimize the potential for any undue prejudice.  *See State v. Martin*, 704 N.W.2d 665, 673 (Iowa 2005); *see also State v. Esse*, No. 03-1739, 2005 WL 2367779, at *4 (Iowa Ct. App. Sept, 28, 2005) ("Pursuant to Iowa Rule of Evidence 5.105, when evidence is admissible for one purpose, but not for another, the district court shall, upon request, restrict the evidence to its proper scope and give a limiting instruction.").

Krogmann already raised this claim in his PCR action. *Krogmann*, 914 N.W.2d at 325. Our supreme court addressed the issue because it was likely to arise again and concluded merger does not apply to attempted murder and willful injury causing serious injury. *Id.* The supreme court was correct that the issue would reoccur. Krogmann puts forth the same argument as he did in his PCR action. He recognizes current supreme court precedent forecloses his claim but argues those cases, including his own PCR appeal, were wrongly decided. We do not have the ability to overturn supreme court precedent. *See State v. Hastings*, 466 N.W.2d 697, 700 (Iowa Ct. App. 1990) ("We are not at liberty to overturn Iowa Supreme Court precedent."). Moreover, as the State highlights, Krogmann's challenge is barred by issue preclusion. "Issue preclusion is a type of res judicata that prohibits parties 'from relitigating in a subsequent action issues raised and resolved in [a] previous action.'" *Barker v. Iowa Dep't of Pub. Safety*, 922 N.W.2d 581, 587 (Iowa 2019) (alteration in original) (citation omitted). So should Krogmann be convicted of both counts on retrial, the offenses will not merge as the supreme court already determined. *Krogmann*, 914 N.W.2d at 325.

**III. Conclusion**

Sufficient evidence supports Krogmann's conviction for attempted murder, so he is not entitled to judgment of acquittal. However, the district court should have permitted Krogmann to introduce exhibit A because it was not hearsay and it was the best evidence of Special Agent Liao's interview of Krogmann. So we reverse the district court's ruling on exhibit A. We reverse Krogmann's convictions and remand for new trial.

**REVERSED AND REMANDED FOR NEW TRIAL.**