# IN THE SUPREME COURT OF IOWA

No. 21–1617

Submitted September 13, 2023—Filed December 1, 2023

**STATE OF IOWA,**

Appellee,

vs.

**ROBERT PAUL KROGMANN,**

Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Delaware County, Linda M. Fangman, Judge.

The State seeks further review of a court of appeals decision ordering a new trial in an attempted murder case because of an error in the application of the hearsay rule. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED; WRIT OF CERTIORARI GRANTED AND SUSTAINED IN PART; REMANDED FOR REDETERMINATION OF COSTS.**

Mansfield, J., delivered the opinion of the court, in which Christensen, C.J., and Waterman, McDonald, and May, JJ., joined. McDermott, J., filed a dissenting opinion, in which Oxley, J., joined.

Angela Campbell (argued) and Jamie L. Hunter of Dickey, Campbell & Sahag Law Firm, PLC, Des Moines, for appellant.

Brenna Bird, Attorney General, and Martha E. Trout (argued), Assistant Attorney General, for appellee.

**MANSFIELD, Justice.**

### I. Introduction.

Fourteen years ago, Robert Krogmann fired three shots from a .44 Magnum at close range at his former girlfriend, nearly killing her. He was convicted of attempted murder and willful injury causing serious injury. His convictions were affirmed on direct appeal. *State v. Krogmann*, 804 N.W.2d 518, 527 (*Krogmann I*) (Iowa 2011).

In 2018, on postconviction relief, we granted Krogmann a new trial because an improper asset freeze had interfered with his defense rights. *Krogmann v. State*, 914 N.W.2d 293, 326 (*Krogmann II*) (Iowa 2018). The State retried Krogmann, and in 2021, he was again convicted of attempted murder and willful injury. Krogmann appealed once more, and the court of appeals has now vacated his convictions and ordered a third trial. The court of appeals reasoned that the district court erroneously excluded from evidence a video of Krogmann's interview with law enforcement right after the shooting; Krogmann sought to introduce the video to support his defense of diminished capacity. The court of appeals determined that the interview was not hearsay because it wasn't being used to show the truth of what Krogmann said but to illustrate Krogmann's behavior and demeanor after the shooting.

On further review, we now hold that the court of appeals was right about the legal significance of the interview but wrong about its practical significance. The video was not hearsay: Krogmann's statements were inculpatory, not exculpatory, and the real purpose of using the video was to show Krogmann's mental state during the interview, a subject on which a prosecution witness had already testified. So the video should have been admitted at trial. However, the refusal to admit the video didn't affect Krogmann's substantial rights. All things considered, the video would not have provided meaningful help to Krogmann's

diminished capacity defense. Because we find the error with respect to the video harmless, and we also reject Krogmann's other claims of error, we conclude that Krogmann's convictions and sentence should be affirmed. We do, however, uphold certain objections by Krogmann to the award of costs and remand only for recalculation of those costs.

## II. Background Facts and Procedural History.

**A. Background Facts.** Robert Krogmann and J.S. began dating in 2007. At the time, both were divorced and in their forties. They had known each other since childhood, having attended the same middle school and high school in Delaware County.

Krogmann had struggled with certain mental health issues over the years and had been diagnosed with depression and bipolar disorder. He had been hospitalized for treatment a few times, the most recent being in 2006.

In late January 2009, Krogmann decided to break off the relationship with J.S. Then for a while, the couple got back together. But J.S. noticed that Krogmann was communicating with other women through an online dating site. J.S. decided to end the relationship once and for all. As she put it, "I told him that I wasn't going to do it anymore and that I was done."

Krogmann did not accept that decision. He called and texted J.S. many times a day, brought flowers to her at work, and showed up at her home in Dundee unannounced. J.S. told Krogmann that he needed to move on.

Krogmann worked as a farmer and also as a part-time sales representative at a John Deere farm equipment dealership. On March 12, Krogmann's employer asked him to travel the next day to Sigourney, about two hours away, to pick up a new planter. Krogmann said he could not do that. That evening, Krogmann played cards with his friends and appeared to be acting normally.

On March 13, around 7:40 a.m., Krogmann called the dealership and reiterated that he could not go to Sigourney. However, Krogmann did agree to pick up a check from a dealership customer who lived about twenty minutes away. Krogmann had retrieved the check by about 8:15 a.m. that morning.

That same day, around 8:30 a.m., Krogmann appeared—again without warning—at J.S.'s home. She let him in and they talked for a little while in the kitchen. Krogmann asked if they could get back together and J.S. said no. Krogmann then asked if he could give J.S. a hug and she agreed.

J.S. went to get a cup of coffee. When she turned back around, Krogmann was pointing a handgun at her—a .44 Magnum. Krogmann told J.S. that they were going to die together that day. He added that if he couldn't have her, no one could.

Krogmann fired his first shot, striking J.S. in the stomach. J.S., still standing, asked Krogmann to call 911. Krogmann replied that he had left his phone in his vehicle on purpose so he wouldn't be able to call. He said he was going to kill her and then kill himself. He told her that he was not going to spend the rest of his life in jail.

Krogmann fired a second shot, which went through J.S.'s hand and arm. J.S. again begged Krogmann to call 911, but he repeated that he would not do so. Krogmann also refused to get J.S.'s phone out of the bedroom.

Krogmann fired a third shot, which struck J.S. in the spine and caused her to collapse on the ground. J.S. again asked Krogmann for her phone; he once more declined. Krogmann did agree to get J.S. a pillow and her rosary. While doing so, he told her, "I really didn't think it would take this long for you to die."

Krogmann then retrieved J.S.'s phone from the other room and used it to call his son Jeff. J.S. heard Krogmann say, "I did it. I shot [J.S.]." Jeff had

actually taken some of Krogmann's guns from him two days before the shooting because he was concerned that Krogmann was going to hurt himself.

J.S. believed she was going to die. She wanted to speak to her mother one last time. Krogmann dialed J.S.'s mother on the phone. J.S. told her mother that she loved her. She asked her mother to tell her father and her girls that she loved them as well and to call her brother, M.S.

At this point, Krogmann ended the phone call with J.S.'s mother and used the phone to call 911 himself. Krogmann provided the dispatcher with J.S.'s home address and asked her to send an ambulance because "someone's been shot." The dispatcher asked who had been shot and how they had been shot. Krogmann didn't respond and continued to ask for an ambulance. He then hung up.

The dispatcher called back, told Krogmann that she had paged an ambulance, and asked Krogmann to tell her "what's going on." Krogmann said that J.S. had been shot. He reiterated, "just please hurry." Again, the dispatcher asked, "how did she get shot and where was she shot at." Krogmann responded, "just send an ambulance."

The dispatcher pressed for more information:

911 dispatcher: Please tell me what happened? What happened?

Krogmann: A squabble, a squabble between the two of us.

911 dispatcher: A squabble?

Krogmann: Um-hm.

911 dispatcher: Okay, and where is the gun now?

Krogmann: I have it.

911 dispatcher: You have it?

Krogmann: Um-hm.

911 dispatcher: And how did she get shot?

Krogmann: I shot her.

911 dispatcher: You shot her?

Krogmann: Um-hm.

Krogmann asked the operator to hurry and to "please save her."

Soon thereafter, people began arriving at J.S.'s home. Krogmann's son Jeff came in and took Krogmann's gun away. J.S.'s brother, M.S., showed up and used a broom to chase Krogmann out of the house. Several minutes later, law enforcement and first responders arrived.

When law enforcement reached the scene, Krogmann had already departed, and Jeff was in the process of leaving "in a hurry." Law enforcement followed Jeff to his father's home. Jeff then called his father and asked him to come home. Krogmann drove home as requested by his son and was observed to be driving properly. Krogmann stopped the vehicle at the house, exited on command by law enforcement, and was apprehended. The officers recounted that Krogmann did not seem to be impaired, was calm, and cooperated with their requests. He did not resist. One officer commented that "there was nothing . . . out of the ordinary" about Krogmann's arrest. When placed in the patrol car, Krogmann asked how J.S. was doing.

Krogmann was taken to the Delaware County Sheriff's office, where he was left in the office but placed in a restraint chair that bound him by his shoulders, hands, and feet. Within about an hour, Special Agent Jack Liao of the Iowa Division of Criminal Investigation arrived and interviewed Krogmann. Krogmann confessed to shooting J.S. and said he had done "a terrible thing." This interview was recorded on video. During the course of the interview, Agent Liao arranged for Krogmann's arm and hand restraints to be removed.

Meanwhile, J.S. was airlifted to University of Iowa Hospitals and Clinics with life-threatening injuries. She had received a laceration in her liver four inches long and two inches deep. She lost part of her small intestine and colon. She sustained a fracture of her right arm. One of her vertebrae was shattered, and her spinal cord was damaged.

J.S. was hospitalized for three weeks and underwent multiple surgeries. She was in a wheelchair and had a colostomy bag for a year. To this day, she walks with a cane because she has no feeling or balance in her feet. She is unable to work and lives in constant pain.

**B. Krogmann's First Trial and First Appeal.** On March 23, the State charged Krogmann by trial information with one count of attempted murder, a class "B" felony, and one count of willful injury causing serious injury, a class "C" felony. Iowa Code §§ 707.11, 708.4(1) (2009). Krogmann's case went to trial in November of that year. Krogmann, who had a significant history of mental illness, raised a diminished capacity defense. A jury found him guilty, rejecting that defense. Krogmann was sentenced to consecutive terms of imprisonment totaling thirty-five years.

Krogmann appealed. *Krogmann I*, 804 N.W.2d 518. His primary argument was that the district court had erred in freezing all of his roughly $3.4 million in assets at the county attorney's request, thereby impairing his ability to present a defense. *Id.* at 521–23. While Krogmann was allowed to pay his retained counsel, Krogmann pointed out that he had been refused permission to use his assets to post bail or pay for a jury consultant. *Id.* at 522.

In October 2011, we affirmed Krogmann's convictions and sentence, holding that he had not preserved error on his objections to the asset freeze. *Id.* at 523–25, 527. Nonetheless, we remarked that "[w]e [were] troubled by the State's effort to tie up a criminal defendant's personal assets without citing any

rule or statute, without making a verified filing, and without citing the district court to relevant [adverse] authority." *Id.* at 525. We added that "[w]e [were] also troubled by the State's attempts to use the asset freeze, once it was in place, to object to defense expenditures not on the ground they would jeopardize restitution or other victim compensation (the alleged reasons for the asset freeze), but simply because the State deemed them unnecessary." *Id.*

**C. Krogmann's Application for Postconviction Relief and Appeal.** A year later, Krogmann filed an application for postconviction relief, alleging, among other things, that his 2009 trial counsel had provided ineffective assistance in failing to assert proper objections to the asset freeze. *Krogmann II*, 914 N.W.2d at 301. The postconviction-relief application went to a hearing in January 2015. *Id.* A jury consultant testified to recommendations she would have made at the original trial; she "was highly critical of the voir dire [approach followed] by Krogmann's trial counsel." *Id.* at 302. "Krogmann [himself] testified that if he had bonded out, he would have hired additional" attorneys and would have been able to communicate more readily with counsel. *Id.* at 303.

The district court denied Krogmann's application. *Id.* at 305. Krogmann appealed again, and we transferred the case to the court of appeals. *Id.* That court affirmed the district court's ruling. *Id.* We then granted Krogmann's application for further review. *Id.*

In June 2018, we ordered a new trial for Krogmann. *Id.* at 326. We held that the asset freeze violated Krogmann's rights to counsel under the Sixth Amendment to the United States Constitution and article I, section 10 of the Iowa Constitution, and that Krogmann's trial counsel had breached an essential duty in not properly objecting to it. *Id.* at 308, 318–21. We further held, specifically under article I, section 10, that the improper asset freeze amounted to a structural error, which meant that Krogmann was not required to prove the

prejudice normally required for an ineffective assistance of counsel claim. *Id.* at 324–25. Two members of our court dissented from our decision. *Id.* at 326–30 (Mansfield, J., dissenting).

**D. Krogmann's Second Trial.** Krogmann's second trial began on August 17, 2021. Again, his defense was diminished capacity; Krogmann acknowledged that he had shot J.S. three times.

Agent Liao testified for the State. He explained that during his interview of Krogmann shortly after the shooting, Krogmann had no detectable signs of intoxication or impairment. According to Agent Liao, Krogmann tracked the questions he was being asked and stayed on topic. Agent Liao also testified to Krogmann's admissions in the interview. These included Krogmann's statements that he had "shot, shot, shot at [J.S.]," that J.S. had told him to stop, and that he (Krogmann) had done "a terrible thing."

On cross-examination, Krogmann's counsel inquired further about Krogmann's demeanor during the interview. Agent Liao admitted that Krogmann was speaking quietly, whispering at times, and that there would sometimes be a long pause between the question and the answer. Agent Liao could not recall whether he had asked Krogmann during the interview why he was so tired. He admitted, however, that he had watched the video of the interview within the last forty-eight hours before giving his trial testimony.

On redirect, the State used the transcript of the video of the interview to refresh Agent Liao's recollection. Thereafter, Krogmann moved for the admission of the video itself. Krogmann's counsel argued that the video showed Krogmann's demeanor and mental state shortly after the shooting, that the State had opened the door by asking Agent Liao about these matters, that the video was not being offered for the truth of any statements made by Krogmann, and that the video was the best evidence of the interview. As it had before trial, the State objected

to the admission of the video. The district court—which had previously ruled that the video amounted to inadmissible hearsay—reiterated that ruling and sustained the State's objection.

Delaware County Sheriff John LeClere also testified. He was the first responder to arrive at the crime scene. Over Krogmann's objection, the State wrapped up their questioning of Sheriff LeClere as follows:

> Q. Is it unusual to take a .4[4], a gun that can take down a deer, shoot someone three times in the mass, center mass, and not think that they're going to die?
>
> A. I would think --
>
> MS. CAMPBELL: Objection, Your Honor, relevance, personal knowledge and argumentative.
>
> THE COURT: Overruled.
>
> A. I think the only reason to shoot a person would be to take their life.

Krogmann sought unsuccessfully to introduce evidence of his $1.5 million civil settlement with J.S. Before trial the district court had granted the State's motion in limine to exclude that evidence, and it stood by that ruling at trial.

Both sides offered expert testimony on diminished capacity. Each side's expert acknowledged that Krogmann had suffered from depression and bipolar disorder and had a long history of hospitalizations for mental illness and prior suicide attempts. However, the State's expert and Krogmann's expert differed as to whether Krogmann had the capacity to form the specific intent to kill J.S.

Also, over the objection of Krogmann's counsel, the State's expert Dr. James Dennert was allowed to testify on the legal meaning of and justification for the diminished responsibility defense. Specifically, Dr. Dennert explained,

My understanding is . . . that we don't want to hold people responsible for actions if they really weren't in some way, and if the person is unable to form an intent to do an action, it seems unfair to hold that person responsible for committing the action. That's a different question from whether the person intended -- well, I'm not going -- that's good enough.

Unlike Dr. Dennert, Krogmann's expert Dr. Tracy Thomas had reviewed the video of Liao's interview of Krogmann, and she testified that it was an important contemporary record of Krogmann's condition directly after the shooting.

As part of the final jury instructions, the district court advised the jury as follows:

If a person has the opportunity to deliberate and uses a dangerous weapon against another, you may, but are not required to, infer that the weapon was used with specific intent to kill.

Krogmann objected to this instruction on the ground that it applied only to first-degree murder cases, not attempted murder cases in which no death occurred.

At the conclusion of the trial, a jury again found Krogmann guilty of attempted murder and willful injury causing serious injury. As before, he was sentenced to consecutive terms of imprisonment totaling thirty-five years.

**E. The Current Appeal.** Krogmann appealed. In the present appeal, Krogmann maintains that the district court erred in excluding the video of his interview with Agent Liao, in admitting Sheriff LeClere's testimony that "the only reason to shoot a person would be to take their life," in excluding evidence of the civil lawsuit and settlement, in allowing Dr. Dennert to testify on the law of diminished responsibility, in instructing the jury that all assaults are specific-intent crimes for the purposes of diminished responsibility, and in instructing the jury that it could infer intent to kill from Krogmann's use of a dangerous weapon against J.S. Krogmann also contends that the verdict was contrary to

the law and evidence, that the attempted murder count and the willful injury causing serious injury count should have merged, and that costs were assessed in error.

We transferred the case to the court of appeals. After hearing argument, the court of appeals issued a decision on March 8, 2023, that reversed and remanded for a new trial. The court agreed with Krogmann that the video of his interview with Agent Liao shortly after the shooting should have been admitted. In the court of appeals' view, the video was not being offered for the truth of the matter asserted; Krogmann's statements on the video were actually inculpatory. Instead, Krogmann sought to use the video "as evidence of his diminished capacity." As the court of appeals put it, "[f]rom the video, the jury would have been able to observe his conduct, demeanor, and ability to follow a conversation. None of that amounts to hearsay." The court of appeals also concluded that the trial court's refusal to admit the video violated the "best evidence rule," because the video was "the best evidence of Krogmann's conduct and demeanor right after the shooting rather than having Special Agent Liao and the expert describe it." The court of appeals did not reach Krogmann's remaining arguments other than to reject his contention that the two counts should merge.

We granted the State's application for further review.

**III. Standard of Review.**

Generally, we review district court decisions regarding the admission of evidence for an abuse of discretion. *State v. Dessinger*, 958 N.W.2d 590, 597 (Iowa 2021). But "[w]e review evidentiary rulings on hearsay for errors at law." *State v. Skahill*, 966 N.W.2d 1, 8 (Iowa 2021).

"We review challenges to jury instructions for correction of errors at law." *State v. Ross*, 986 N.W.2d 581, 584 (Iowa 2023).

"We review for abuse of discretion a ruling denying a motion for a new trial on grounds the verdict is against the weight of the evidence." *State v. Wilson*, 941 N.W.2d 579, 584 (Iowa 2020) (quoting *State v. Heard*, 934 N.W.2d 433, 439 (Iowa 2019)).

"We review the district court's . . . order [on costs] for errors of law." *State v. McMurry*, 925 N.W.2d 592, 595 (Iowa 2019) (quoting *State v. Petrie*, 478 N.W.2d 620, 622 (Iowa 1991) (per curiam)). "[W]e seek to 'determine whether the court's findings lack substantial evidentiary support, or whether the court has not properly applied the law.' " *Id.* (quoting *State v. Bonstetter*, 637 N.W.2d 161, 165 (Iowa 2001)).

**IV. Legal Analysis.**

**A. Refusal to Admit Video of Krogmann's Interview.** The district court excluded the video of Krogmann's interview because it believed it was hearsay. However, the court of appeals concluded that the interview should have been admitted because it was not truly hearsay; it was not being offered for the truth of statements made by Krogmann. After watching the video, we agree with the court of appeals. In fact, we are somewhat puzzled as to why the State fought so hard to keep the video out of evidence.

"Hearsay 'is a statement, other than one made by the declarant while testifying at the trial . . . offered in evidence to prove the truth of the matter asserted.' " *State v. Veverka*, 938 N.W.2d 197, 199 (Iowa 2020) (omission in original) (quoting *State v. Dullard*, 668 N.W.2d 585, 589 (Iowa 2003)). The interrogation video was clearly an out-of-court statement, but Krogmann did not seek to enter it to prove the truth of his statements therein.

Virtually nothing that Krogmann says on the video can be viewed as exculpatory. He admits he shot J.S. and did a terrible thing. Krogmann's version

of events differs from J.S.'s only in that he claims he went to the truck to get his gun before shooting her. This difference hardly strikes us as helpful to his case.

At the same time, the video bore upon Krogmann's diminished responsibility defense because it showed his mental state soon after the shooting. Significantly, the State introduced testimony at the 2021 trial from Agent Liao about Krogmann's demeanor and reactions during the interview. Why would Agent Liao's testimony as to how Krogmann appeared twelve years ago be relevant, but not a contemporaneous 2009 video showing the same thing?

We agree with the district court and the State that Krogmann's stated purpose for introducing the evidence isn't controlling. As we said recently,

> [W]hen the out-of-court statement is used to prove something other than the truth of the matter asserted, such as responsive conduct, the statement may be admissible as nonhearsay. However, "the court must determine whether the statement is truly relevant to the purpose for which it is being offered, or whether the statement is merely an attempt to put before the fact finder inadmissible evidence."

*Dessinger*, 958 N.W.2d at 603 (citation omitted) (quoting *State v. Mitchell*, 450 N.W.2d 828, 832 (Iowa 1990)); *see also Hawkins v. Grinnell Reg'l Med. Ctr.*, 929 N.W.2d 261, 265–66 (Iowa 2019) ("We do not rely on the purpose urged by the party offering the alleged hearsay; rather we look at the true purpose for which the party offered the testimony."). Also, even if the proffered statements are relevant and are not hearsay, they may be excluded if their probative value is substantially outweighed by other considerations such as unfair prejudice. *See* Iowa R. Evid. 5.403; *see also Veverka*, 938 N.W.2d at 202 (noting that the admissibility of evidence covered by a hearsay exception is subject to rule 5.403).

Here, though, we believe an objective assessment of the facts and circumstances confirms that Krogmann was trying to use the video to prove his mental state, not to impart to the jury his version of what had happened through

his own out-of-court statements. The case of *State v. Veal*, where the defendant tried that stratagem, is therefore inapplicable, and the district court erred in relying on it. *See* 564 N.W.2d 797, 808 (Iowa 1997), *overruled in part on other grounds by State v. Hallum*, 585 N.W.2d 249 (Iowa 1998), *vacated*, 527 U.S. 1001 (1999).

Nor do we believe there would have been any unfair prejudice to the State in admitting the video.[1] From our admittedly imperfect vantage point, we question whether the video even would have assisted Krogmann's diminished responsibility defense. Much of the video appears to show Krogmann reacting in shame to his own actions. When Krogmann actually speaks on the video, he describes, in a self-serving way, the decision-making process he went through that morning, while blaming his victim for not caring sufficiently about him. Consider the State's own summary of the video:

> These [statements by Krogmann] include Krogmann's inquiries into whether [J.S.] is "okay," the *Miranda* warning, Krogmann saying he "went over to talk to her," that he "loved her so much," he "was so good to her and wanted to marry her," she "let him in," she "didn't want me," his gun was in his truck on the passenger seat, she told him to leave and move on with his life, he wanted to tell her "how much it hurt him," "she didn't care," he was "tired," he shot her, she should have "just told him," she said [s]he wanted a pillow, called his son Jeff, he called 911 from her cell phone, that he "sometimes" carries a gun, the gun was in his truck and he did not recall when he put it in the truck, he kept the gun for the "varmints at the farm," he made up his mind to talk to her that morning, inquired about counsel, long pauses where Krogmann shifts in the chair and does not respond but sighs, said "if she'd just told me the truth," he could

---

[1]Our rules of evidence allow evidence to be admitted for a limited purpose with a cautionary instruction even though that same evidence is inadmissible for another purpose. *See* Iowa R. Evid. 5.105. "When admissibility is limited, the court 'restrict[s] the evidence to its proper scope and instruct[s] the jury accordingly.'" *State v. Decker*, 744 N.W.2d 346, 356 (Iowa 2008) (alterations in original) (quoting Iowa R. Evid. 5.105). *State v. Decker* involved the use of an otherwise inadmissible video to show the defendant's demeanor—a related issue to that presented here. *Id.*

not reach in the truck to get the gun, and she did not run because she had nowhere to go.

(Citations omitted.) We struggle to see how these statements—which together form Krogmann's detailed narrative of *how and why* he shot J.S.—demonstrate that Krogmann *lacked the capacity to form a specific intent* to shoot her.[2]

This court has recognized the diminished responsibility defense since 1964. *See State v. Gramenz,* 126 N.W.2d 285, 288 (Iowa 1964) ("We have not heretofore considered the theory of diminished responsibility."); *id.* at 290 ("We approve of the trial court's instruction which, under the facts of the case, permitted the jury to consider evidence of defendant's mental condition on the issue of willfulness, deliberation and premeditation."). "The diminished responsibility defense allows a defendant to negate the specific intent element of a crime by demonstrating due to some mental defect she did not have the capacity to form that specific intent." *Anfinson v. State,* 758 N.W.2d 496, 502 (Iowa 2008).

But a jury will undoubtedly consider any asserted diminished responsibility defense in the light of trial facts that tend to establish the defendant's specific intent. For example, in *State v. Jacobs,* "[a]ll agreed the defendant suffered from bipolar affective disorder." 607 N.W.2d 679, 684 (Iowa 2000). But we affirmed the trial court's rejection of that defense, noting that the actual facts surrounding the defendant's criminal conduct tended to undermine the opinions of his expert. *Id.* at 685. In *Lamasters v. State,* a first-degree murder case, we determined that the defendant's trial counsel had not been ineffective

---

[2]One aspect of the video that might have aided Krogmann's defense is that it shows him tied to a chair by arm, shoulder, and leg restraints. (During the course of Agent Liao's interview, the arm and shoulder restraints were removed.) The presence of these restraints—as opposed to handcuffs, say—could suggest that law enforcement viewed Krogmann as posing a special type of risk due to his mental health condition. Agent Liao testified about these restraints, but seeing them in use might have resonated more with the jury.

in failing to raise a diminished responsibility defense, despite the defendant's history of methamphetamine use and mental illness, noting that the defendant's "elaborate efforts to conceal the killing" and his "carr[ying] on [of] ordinary activities" during that time tended to undermine such a defense. 821 N.W.2d 856, 869 (Iowa 2012).

Diminished responsibility claims have fallen short in our courts in many contexts when there is strong evidence that the defendant possessed the required specific intent. *See State v. Watkins*, 659 N.W.2d 526, 534 (Iowa 2003) (acknowledging testimony that the "defendant suffered from posttraumatic stress disorder, borderline personality disorder, and depression" and determining that it "was insufficient to show a diminished responsibility on defendant's part with respect to any particular volitional act"); *State v. Myers*, 653 N.W.2d 574, 581 (Iowa 2002) (rejecting an argument of diminished capacity with respect to a defendant's "guilty-plea [where the] colloquy . . . support[ed] the State's claim that she, in fact, did understand what she was doing"); *State v. Buck*, 510 N.W.2d 850, 853–54 (Iowa 1994) (finding no prejudice, even if the defendant failed to properly waive the right to a jury trial in a case involving defenses of insanity and diminished responsibility, because the evidence of defendant's specific intent was "overwhelming"); *State v. Freeman*, 404 N.W.2d 188, 191 (Iowa Ct. App. 1987) (finding that the factual evidence including the defendant's own statements "refute[d] defendant[']s argument he was suffering from a multiple personality disorder *at the time of the offense*"); *State v. Griffin*, 389 N.W.2d 858, 861 (Iowa Ct. App. 1986) (finding no reversible error in failure to instruct on diminished capacity given the overwhelming evidence of guilt).

This leads to where we ultimately part company with the court of appeals. The court of appeals declined to find that the exclusion of the video had been harmless, noting that it "goes to the heart of Krogmann's defense of diminished

responsibility." But that begs the question of how strong that defense was and how much the video would have bolstered it. After studying the record as a whole, we are convinced that the exclusion of the video did not affect Krogmann's "substantial right[s]." Iowa R. Evid. 5.103(*a*); *see also State v. Richards*, 809 N.W.2d 80, 90 (Iowa 2012) (applying this standard to wrongfully excluded evidence); *State v. Newell*, 710 N.W.2d 6, 19 (Iowa 2006) (applying this standard to errors regarding the admission of hearsay evidence).[3]

Krogmann's own statements, both on the video and as related by J.S., provided strong evidence of his specific intent to kill her on March 13, 2009. This evidence of intent was bolstered by the 911 recording of Krogmann's call made just minutes after the shooting. On the call, Krogmann initially tried to deflect the dispatcher's inquiries as to how J.S. had been shot. Eventually, Krogmann admitted to the dispatcher that there had been a "squabble" and that he had "shot [J.S.]." Throughout the communication, Krogmann comes across as mentally composed even as he is summoning medical help for J.S. Notably, Krogmann's own expert admitted that she focuses on the defendant's behavior and mental health "right around the time of the offense." As she put it, "I have to take the behavior and the statement that the individual is making, observations of them as close to the event as possible and from that make a determination regarding their mental state."

Krogmann's expert characterized the video as showing Krogmann "writhing around in his chair," "panting," "can't even look at the officer," "covering his face," and "unable to organize his thoughts." According to

---

[3]Because this is a case involving nonconstitutional error, the standard in Iowa Rule of Evidence 5.103(*a*) applies, rather than the more stringent standard requiring the State to show the error was harmless beyond a reasonable doubt. *See State v. Buelow*, 951 N.W.2d 879, 890 (Iowa 2020) (nonconstitutional error); *State v. Gibbs*, 941 N.W.2d 888, 900 (Iowa 2020) (constitutional error).

Krogmann's expert: "[Krogmann's] responses to the detective are very short. He often does not respond to the detective's questions, and the responses are oftentimes not completely relevant to the question." Even if these characterizations were accurate, and our view of the video is rather different and closer to Agent Liao's characterization, we fail to see how they would lead a jury to conclude that Krogmann lacked the capacity to form an intent to kill J.S.

The four family members who testified on Krogmann's behalf did not meaningfully support his diminished responsibility defense, either. Instead, they confirmed that at the time of the shooting Krogmann farmed, had a part-time outside job, drove his vehicle every day, attended social events, and visited with family. They also reported Krogmann was very upset that J.S. had broken up with him and made statements about committing suicide.

In addition, the State offered testimony that Krogmann engaged in "ordinary activities" such as playing cards and clearing his calendar with his employer so he would have time to go over to J.S.'s home that morning. *See Lamasters*, 821 N.W.2d at 869 (citing evidence that the defendant "carried on ordinary activities" as undermining his "defense of diminished capacity"). Like the excluded video and the admitted 911 call, this evidence paints the picture of a distraught, spurned lover, not someone who lacked the mental capacity to form an intent to do what he did. The totality of the evidence of Krogmann's intent to kill, including the video, is simply overwhelming.

The dissent's contrary view cannot be squared with the facts or the law. This trial wasn't a "battle of the experts" because there was so much direct evidence of Krogmann's specific intent to kill J.S. This included Krogmann's statements to J.S. and the 911 calls. The 911 calls are especially compelling because it took a call back from the dispatcher and repeated pressing from the

dispatcher before a reluctant but composed Krogmann admitted who had shot J.S., namely Krogmann himself.

And if the video taken at the sheriff's office had been admitted, it too would have provided powerful direct evidence of Krogmann's specific intent. There again Krogmann admitted to shooting J.S. and to having done a "terrible thing." The dissent does not dispute that Krogmann made these statements and that his narrative of what happened—although it took a while to come out—was clear and consistent. Krogmann spoke graphically on the video of being hurt when J.S. said she would not have him and then deciding to shoot her.

Turning to the law, the dissent overlooks that the harmless-error standard is the same whether for admitted or for excluded evidence. *See, e.g., State v. Sullivan*, 679 N.W.2d 19, 31 (Iowa 2004) ("[T]he district court abused its discretion in *admitting* [the evidence at issue] and such admission was prejudicial, that is, it affected [the defendant's] substantial rights . . . ." (emphasis added)); *State v. Montgomery*, 966 N.W.2d 641, 661 (Iowa 2021) ("We must decide whether the erroneous *exclusion* of this evidence was harmless. Reversal is required for evidentiary error when 'the error affects a substantial right of the party.' " (emphasis added) (quoting Iowa R. Evid. 5.103(*a*))); *State v. Paredes*, 775 N.W.2d 554, 571 (Iowa 2009) ("Reversal of a ruling *which admits or excludes evidence* is not necessary unless a substantial right of a party is affected." (emphasis added)).[4]

---

[4]Other jurisdictions have found harmless error in cases involving wrongful exclusion of video evidence. *See, e.g., State v. Leniart*, 215 A.3d 1104, 1128 (Conn. 2019) ("Although we agree with the Appellate Court that polygraph pretest interview evidence is not per se inadmissible . . . therefore, that the video was improperly excluded on that basis, we conclude that any error in the exclusion of the video was harmless."); *State v. Blank*, 955 So. 2d 90, 133 (La. 2007) ("After careful review of the entire transcript of the . . . interrogation . . . and the videotaped version in the record, we find nothing to support defendant's argument that had the jury seen the . . . interrogation, they would have concluded that defendant's statement was coerced."); *State v. Botelho*, 83 A.3d 814, 824 (N.H. 2013) ("Thus, we conclude that the court's exclusion of the two

Furthermore, we are not obligated to decide an appeal based on the argument the State chooses to emphasize. Here, the State—mistakenly—placed a large wager on the video being inadmissible hearsay. But the State did hedge its bets by raising harmless error, and we may decide the case on that basis.

Lastly, the dissent errs when it tries to add the votes of the court of appeals' panel to its own vote total. We have the utmost respect for our colleagues on the third floor, but our duty is to make our decisions on our own. We are not persuaded by the brief harmless error discussion in the court of appeals opinion, which did not delve into the specific facts of this case.

For the foregoing reasons, we conclude that the failure to admit the video, while erroneous, was harmless and not a basis for a new trial.[5]

**B. Admission of Sheriff LeClere's Testimony Regarding "the Only Reason to Shoot a Person."** Krogmann next argues that the district court

---

disputed sections of the police interview was neither clearly untenable nor unreasonable to the prejudice of the defendant's case."); *McCracken v. State*, 887 P.2d 323, 328 (Okla. Crim. App. 1994) ("We have viewed the video tape in question and find that any error in failing to allow the jury to view the tape was harmless in light of the overwhelming evidence of Appellant's guilt."); *State v. Cottier*, 755 N.W.2d 120, 132 (S.D. 2008) ("Even if the trial court erred in failing to admit the video, 'the error was harmless as the evidence was cumulative of other evidence presented independently at trial.'" (quoting *State v. Davi*, 504 N.W.2d 844, 855 (S.D. 1993))).

[5]However, we do not share the court of appeals' view that the district court's refusal to admit the video violated the "best evidence" rule. That rule provides, "[a]n original writing, recording, or photograph is required to prove its content, unless these rules or a statute provides otherwise." Iowa R. Evid. 5.1002. Here the real issue wasn't the content of the video; it was the content of the interview. The video may have been, in layperson's terms, "the best evidence" of that interview, despite some issues with its sound quality. Yet that doesn't mean its exclusion implicated rule 5.1002. *See State v. Khalsa*, 542 N.W.2d 263, 268 (Iowa Ct. App. 1995); 7 Laurie Kratky Doré, *Iowa Practice Series Evidence* § 5.1002:2, at 1366–67 (2023–2024 ed. 2023).

We note also that the State failed to make a separate harmless error argument in its answering brief, as it did with respect to the LeClere and Dennert testimony discussed later in this opinion. However, the State did argue in its answering brief that "the video did not offer any evidence that would have impacted the issue in the case[:] whether Krogmann could form specific intent." Krogmann responded to this single sentence with three pages of argument in his reply brief. The gist of Krogmann's rebuttal was that the video was "exceptionally material." The court of appeals later agreed with Krogmann and concluded that any error was not harmless. The question of harmless error is properly before us.

should have sustained his objection to Sheriff LeClere's testimony that "the only reason to shoot a person would be to take their life." We agree with Krogmann. We are not persuaded by the State's contention that this testimony involved "scientific, technical, or other specialized knowledge [that would] help the trier of fact." Iowa R. Evid. 5.702. Jurors can understand the consequences of pointing a gun at someone at close range and firing it three times. *See State v. Leahy*, 54 N.W.2d 447, 453 (Iowa 1952) (finding error when the district court admitted an officer's testimony as to the purpose for which the defendant withdrew his gun). They do not need guidance from a law enforcement officer testifying on the ultimate issue of intent.

Yet we also conclude that the erroneous admission of this testimony did not affect Krogmann's substantial rights. *See* Iowa R. Evid. 5.103(*a*); *State v. Neiderbach*, 837 N.W.2d 180, 205 (Iowa 2013) (finding no reversible error in the improper admission of expert testimony). There was a great deal of other evidence presented regarding Krogmann's actions and intent on March 13, 2009— evidence that was obviously more substantial. The jury was instructed that they were to determine Krogmann's intent. Although it was unnecessary and gratuitous for the prosecution to offer this testimonial preview of their closing argument, we also trust the jurors not to have given this exercise in theatrics any meaningful weight. "Jurors didn't fall off the turnip truck and into the courtroom." *State v. Veal*, 930 N.W.2d 319, 335 (Iowa 2019). We decline to disturb the jury verdict on this ground.

**C. Refusal to Admit Evidence of Civil Case and Settlement.** J.S. brought a civil suit against Krogmann for her injuries resulting from the shooting. Krogmann paid $1.5 million to settle that suit. During his criminal trial, Krogmann sought to introduce evidence of the civil case and its settlement.

We agree that the district court did not abuse its discretion in excluding this evidence.

Prior to trial, the district court granted the State's motion in limine, rejecting Krogmann's argument that the civil suit showed J.S.'s bias against him. As the district court pointed out, "as it is undisputed that the Defendant shot [J.S.] three times, her bias need not be explained by bootstrapping a later civil suit." However, the district court's pretrial ruling allowed the defense to reurge the admissibility of the civil case at trial if another theory of relevance emerged.

At trial, following J.S.'s testimony that she was unable to go back to work due to her injuries, Krogmann sought again to introduce evidence of the civil settlement. This time, his counsel argued that "the State has slightly opened the door by asking her about her not being able to work." The district court rejected this argument as well, reasoning that the civil settlement wasn't relevant to the severity of J.S.'s injuries and whether or not they left her unable to work.

We agree with the district court's ruling. Neither of these theories of relevance adds up, so the evidence was inadmissible. The $1.5 million settlement might temper the jury's view of Krogmann (which would be an *improper* purpose for admitting it), but it doesn't show that J.S. would have additional bias against him or that she wasn't seriously injured.

On appeal, Krogmann conjures two new theories of admissibility. First, he maintains that the evidence "could have been used to show that the Defendant accepted responsibility for the consequences of shooting [J.S.]." We are not persuaded. Acceptance of responsibility might be a relevant sentencing consideration, but it isn't a relevant trial consideration. In any event, it is a curious argument to make when Krogmann's trial defense was to assert *diminished* responsibility.

Second, Krogmann implies that he wanted to show J.S.'s receipt of $1.5 million—not her injuries—was the real reason she stopped working.[6] But the mere existence of the settlement wouldn't tend to show that; Krogmann would have needed a lot more in his offer of proof. He didn't provide it. No abuse of discretion occurred here.

**D. Admission of Expert Testimony Regarding the Legal Meaning of Diminished Responsibility.** At trial, over Krogmann's objection, the State's mental health expert Dr. Dennert was allowed to testify concerning why the law recognizes a diminished responsibility defense. Dr. Dennert told the jury that "if the person is unable to form an intent to do an action, it seems unfair to hold that person responsible for committing the action."

We believe this legal dissertation should not have been permitted. It is the job of the district court, not a paid expert, to explain the applicable criminal law to the jury. *See Oldham v. Shenandoah Cmty. Sch. Dist.*, 461 N.W.2d 207, 208 (Iowa Ct. App. 1990) ("[E]xperts may not give opinions on questions of law or questions of law mixed with facts.").[7]

---

[6]Also, Krogmann's counsel conceded during closing argument that J.S. had suffered a serious injury from the near-fatal shooting: "There is no question she had and has and continues to have and will always have a serious injury . . . ." Therefore, Krogmann's current argument that he needed to introduce the civil settlement to raise a question about J.S.'s decision to stop working—and thus raise a question about the severity of her injuries—clashes with the position he took at trial.

[7]Notably, the district court initially sustained Krogmann's objection to this line of questioning but allowed Dr. Dennert to respond when the prosecutor artfully repackaged the question so that it asked less overtly for a legal explanation:

> Q. I want to be clear, diminished responsibility does not mean someone --
> or what diminished responsibility means in this context is basically a legal excuse
> for behavior; correct?

> MR. STATLER: Objection, Your Honor. Calls for a legal conclusion.

> THE COURT: Sustained.

Yet we agree with the State that any error here did not affect substantial rights. This isolated answer from Dr. Dennert was a tiny island in a sea of admissible evidence and proper argument on the subject of diminished responsibility. As Krogmann points out in his main brief, diminished responsibility was "the main fighting issue in the case." The district court instructed the jury on the law to be applied, and there is no indication that the jury failed to follow those instructions. Furthermore, although Krogmann criticizes the district court for permitting Dr. Dennert's "commentary," he does not direct us to any particular fallacy in what Dr. Dennert said. We overrule this claim of error.

**E. Trial Court Instructions that Said Specific Intent Was an Element of Assault in a Diminished Capacity Case.** Krogmann next contends that the district court erred in instructing the jury that specific intent is a required element of assault in a diminished capacity case. According to Krogmann, this hamstrung his trial strategy. Presumably believing that a jury was unlikely to

---

BY MS. KRISKO: Q. Diminished responsibility is something that is not saying that the action wasn't done but just that the person shouldn't or could not be responsible for his own action?

MR. STATLER: Objection, Your Honor. That's the same question. It's asking for an excuse.

MS. KRISKO: May I respond?

THE COURT: Actually, it's overruled. I'll let him answer that question.

THE WITNESS: Could you read me back the question?

(The requested portion of the record was read by the court reporter.)

A. My understanding is . . . that we don't want to hold people responsible for actions if they really weren't in some way, and if the person is unable to form an intent to do an action, it seems unfair to hold that person responsible for committing the action. That's a different question from whether the person intended -- well, I'm not going -- that's good enough.

acquit him altogether, Krogmann sought to get the jury to acquit him of the most serious crimes charged based on diminished capacity and instead land on one or more forms of assault as a lesser included offense.

Notably, Krogmann's expert Dr. Thomas testified that at the time of the shooting Krogmann lacked capacity to form specific intent—period. Supported by its own expert, the State argued the other side of the same coin at closing—namely, that Krogmann had specific intent to support all charges and there was no room for a compromise verdict. As the prosecutor put it at the end of her rebuttal argument, "If he didn't have the specific intent, he didn't have it. But if he did, he is guilty of both [attempted murder and willful injury causing serious injury]."

It is established law in Iowa that assault is a specific-intent crime. Thirteen years ago, in *State v. Fountain*, we made clear "that assault includes an element of specific intent." 786 N.W.2d 260, 265 (Iowa 2010). We reasoned that although the legislature had amended the assault statute in 2002 and declared that "assault as defined in this section is a general intent crime," it had not altered the actual elements of assault, including specific intent. *Id.* at 264 (quoting 2002 Iowa Acts ch. 1094, § 1 (codified at Iowa Code § 708.1 (2003))). As we put it, "the legislature did not change the elements of an assault; it merely designated assault as a general intent crime." *Id.* at 265. We reaffirmed *Fountain* in *State v. Benson*, where we reiterated that "regardless of the legislature's designation, assault substantively is a specific-intent crime under section 708.1 based upon the language in the statute." 919 N.W.2d 237, 245 (Iowa 2018).

*Fountain* did contain the following statement: "Although we do not decide the effect or constitutionality of [the 2002] amendment to the assault statute, we believe the amendment was simply an attempt to prevent a defendant charged with assault from relying on the defenses of intoxication and diminished

capacity." 786 N.W.2d at 265. Krogmann seizes on this language to argue that it is at least an open question whether diminished capacity is a defense to assault in Iowa. But we place less stock in this stray language than Krogmann does. For one thing, in reality *Fountain* did decide the "effect" of the 2002 amendment—namely, that the amendment didn't alter the status of assault as a specific-intent crime. Also, what the legislature might "attempt" to do, as recognized in *Fountain,* and what it succeeded in doing are two different things.

In *State v. Beck,* the court of appeals confronted the precise question presented today—whether diminished capacity can negate the specific-intent element of assault. 854 N.W.2d 56, 58–59 (Iowa Ct. App. 2014). After discussing *Fountain* and the 2002 amendment at length, the court concluded that diminished capacity would be a defense to assault. *Id.* at 64–65. Among other things, the court noted a long line of precedent from our court "holding the defense [of diminished capacity] is available *in any case* in which the State must [prove] specific intent." *Id.* at 65. Also, the court emphasized that "[t]he plain language of the 2002 amendment and the legislature's own explanation of the 2002 amendment evidence[] only that the legislature intended to say the assault statute should be interpreted in such a way as to not require the State to prove specific intent as an element of the offense of assault." *Id.* Because "the 2002 amendment did not achieve the stated legislative intent of removing the specific intent elements from the offense of assault . . . the expected legal consequence does not follow." *Id.* at 66.

We agree with the court of appeals' analysis in *Beck.* One cannot coherently say that (1) assault is a specific-intent crime, but (2) diminished responsibility is not a defense to assault. And Krogmann offers no logical path to that destination in his brief. Either diminished capacity negates specific intent or it doesn't. Our precedent holds it does. We find no error here.

**F. Trial Court Instruction that Allowed the Jury to Infer Specific Intent to Kill from Krogmann's Use of a Dangerous Weapon Against J.S.** As noted, Krogmann objected to the district court's giving of an instruction that allowed the jury to infer an intent to kill from Krogmann's use of a dangerous weapon.

An Iowa State Bar Association uniform jury instruction states:

> 700.8 Murder In The First Degree - Dangerous Weapon Inference. If a person has the opportunity to deliberate and uses a dangerous weapon against another resulting in death, you may, but are not required to, infer that the weapon was used with malice, premeditation and specific intent to kill.

Iowa State Bar Ass'n, Iowa Crim. Jury Instruction 700.8 (2023) (emphasis omitted). In *State v. Green*, we approved the giving of this instruction, noting that it "accurately stated the law, and there was substantial evidence . . . to support" it. 896 N.W.2d 770, 781 (Iowa 2017). Likewise, no error occurred when it was given here.

Krogmann points out that *Green* was a first-degree murder case and that the uniform instruction is designated for first-degree murder cases. He contends that such an instruction does not belong in an attempted murder case in which "deliberation" is not a part of the crime. But this misses the key point: in this attempted murder case, the instruction accurately stated the law and was supported by the evidence. *See id.* The instruction permits an inference of "malice, premeditation and specific intent to kill." Iowa State Bar Ass'n, Iowa Crim. Jury Instruction 700.8. The first two are not elements of attempted murder, but the third was in this case.

Therefore, the court did not err in giving the instruction. *See State v. Mart*, 20 N.W.2d 63, 66 (Iowa 1945) ("We have held repeatedly that an intent to kill may be inferred from the use of a deadly weapon in a deadly manner. Such intent

may be thus inferred though the wound inflicted does not prove fatal." (citation omitted)).

**G. Refusal to Grant a New Trial.** Krogmann argues that the district court abused its discretion in failing to grant a new trial on the ground that the verdict was contrary to the law and the evidence. We are not persuaded. Krogmann's actions and statements provided ample evidence from which a jury could find he intended to kill J.S. The gist of Krogmann's position is that if he really intended to kill J.S., he would have discharged the remaining bullets in his gun instead of stopping after shooting her three times and calling 911. But this was at best an argument for the jury, and not a particularly good one in our view. Often people who commit acts of criminal violence regret those acts immediately. That doesn't mean they lacked mens rea in the first place. We affirm the denial of a new trial.

**H. Refusal to Merge the Counts.** Krogmann contends that his willful injury causing serious injury conviction should merge with his attempted murder conviction. Krogmann raised this argument in the postconviction-relief proceedings after his initial convictions. We rejected it then, and we reject it now. *Krogmann II*, 914 N.W.2d at 325. Our prior appellate ruling is the law of the case and, in any event, we stand by it. One can seriously injure someone without intending to kill them, and one can attempt to kill someone without seriously injuring them.

**I. Award of Costs.** Krogmann also challenges the award of prosecution costs. A hearing on court costs occurred below after the entry of the judgment of conviction and sentence. The district court sustained some of Krogmann's objections, including an objection to payment of expert fees for an individual who never testified. Thereafter, Krogmann filed a second notice of appeal. We treat

the second notice of appeal as an application for writ of certiorari, grant the writ, and proceed to review Krogmann's objections to these costs.

The State is entitled to recover "court costs" from a convicted defendant. Iowa Code § 910.1(2) (2021). As a general matter, taxation of costs in criminal cases is governed by Iowa Code chapter 625, unless there is other law to the contrary. *See, e.g., State v. Basinger*, 721 N.W.2d 783, 785–86 (Iowa 2006); *see also* Iowa Code § 625.1 ("Costs shall be recovered by the successful against the losing party."). Against this backdrop, we consider Krogmann's specific objections.[8]

Krogmann contends that the district court erred in ordering him to pay Dr. Dennert's fees and expenses in excess of the $150 per day cap in Iowa Code section 622.72. *See* Iowa Code § 622.72 ("[A]dditional compensation shall not exceed one hundred fifty dollars per day while so employed."). We agree with the State that section 815.5 applies here as an exception to section 622.72. *See id.* § 815.5 ("Notwithstanding the provisions of section 622.72, reasonable compensation as determined by the court shall be awarded . . . expert witnesses called by the state in criminal cases."). In our view, this means that Dr. Dennert's reasonable compensation for the time spent in his actual court appearance and court testimony is recoverable. But the only cap lifted is the $150 per diem in section 622.72. Otherwise, the taxable cost is still based on the concept of a witness allowance. *See id.* § 625.14. The State is not entitled to treat as a taxable cost time spent by Dr. Dennert prior to trial, his air fare from out of state, or his rental car and hotel expense. To that extent, we uphold Krogmann's challenge to the costs.

---

[8]Krogmann accepts that for court costs, we should apply the law that was in effect at the time of his trial.

Krogmann also objects to paying the sheriff's fee for attempting to serve someone who could not be located and who did not testify. We sustain this objection as well. This item does not fall within a recognized category of court costs.

Lastly, Krogman objects to being assessed the State's costs for a transcript of Dr. Dennert's deposition. The deposition wasn't introduced into evidence at trial. We agree with the district court that this transcript can be assessed as a court cost because the language of section 815.13 covers the issue. *See id.* § 815.13 (allowing the cost of transcripts requested by the prosecution to be recovered from the defendant if the defendant is found guilty).

**V. Conclusion.**

For the foregoing reasons, we affirm Krogmann's convictions and sentence. We sustain the writ in part as to the award of costs and remand for recalculation of costs only.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED; WRIT OF CERTIORARI GRANTED AND SUSTAINED IN PART; REMANDED FOR REDETERMINATION OF COSTS.**

Christensen, C.J., and Waterman, McDonald, and May, JJ., join this opinion. McDermott, J., files a dissenting opinion, in which Oxley J., joins.

**McDERMOTT, Justice (dissenting).**

Robert Krogmann's trial centered on one question: Did he have the mental capacity to form the specific intent to commit murder? He sought to play a video of an investigative interview from shortly after the shooting as evidence of his mental state. Although Krogmann confesses to the shooting in the video, *the State* fought hard to exclude it. The majority concludes that the district court erred in not admitting the video, but it nonetheless affirms Krogmann's convictions today by declaring the video's exclusion "harmless." I find nothing harmless about the error and believe that withholding the video from the jury stripped Krogmann of evidence critical to his defense. Any conviction, if one is to be had, must come from a unanimous jury of his peers, not a majority of appellate judges. I thus respectfully dissent.

The State had to prove that Krogmann acted with specific intent. The lack of mental capacity to form a specific intent is known as "diminished responsibility." *Anfinson v. State*, 758 N.W.2d 496, 502 (Iowa 2008). Evidence of diminished responsibility is important to determine someone's capacity to form specific intent. *Id.* Diminished responsibility does not mean that someone is insane; a person may be sane but still not have the mental capacity to form specific intent because of a mental disease or disorder. *See State v. Collins*, 305 N.W.2d 434, 436–37 (Iowa 1981). *Compare State v. Jacobs*, 607 N.W.2d 679, 684 (Iowa 2000) (discussing diminished responsibility as a common law defense), *with* Iowa Code § 701.4 (2009) (insanity defense codified). A defendant does not need to prove diminished responsibility. *Skinner v. Ruigh*, 351 N.W.2d 182, 185 (Iowa 1984). The burden rests with the State to prove that Krogmann was able to—and did—form the specific intent required to commit the crime. *See State v. Rinehart*, 283 N.W.2d 319, 323 (Iowa 1979).

One of the State's primary witnesses, Agent Liao, conducted the video-recorded interview with Krogmann. The fifty-nine-minute video begins with Krogmann strapped to a chair at his wrists, ankles, waist, and around his shoulders. Agent Liao had the wrist restraints removed early in the interview, and later requested that the shoulder restraints also be removed. But the video shows Krogmann remained fastened to the chair at all times by his ankles and waist. Krogmann's first sentence to the investigator is a question about whether the victim was okay. Krogmann speaks softly in the video, often seemingly whispering, and at times there are long pauses between the investigator's questions and his responses.

Both the prosecution and the defense believed the question of Krogmann's mental capacity complex enough to require the hiring of expert medical witnesses to testify on the subject. Expert witnesses are permitted only when "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Iowa R. Evid. 5.702. Both experts agreed that Krogmann suffers from depression and bipolar disorder and noted his long history of hospitalizations for mental illness and prior suicide attempts. But the experts clashed in their views about whether Krogmann lacked the mental capacity to form the requisite specific intent on the day of the shooting.

Krogmann's medical expert, Dr. Thomas, testified about the importance of the video as the only means of observing Krogmann's behavior on that day. She described Krogmann on the video as "writhing around in his chair," "panting," at times unable to "even look at the officer," "covering his face," and "unable to organize his thoughts." The State's medical expert, Dr. Dennert, never watched the video before forming his opinion, despite acknowledging that in preparing to offer an opinion in a case like this, he tries to gather all information, including "any videos." He testified about his conclusions regarding Krogmann's mental

capacity at the time of the shooting based largely on other people's characterizations of Krogmann's behavior that day.

When parties offer competing testimony from expert witnesses—creating the proverbial "battle of the experts"—juries often must decide which of the experts is more credible. Had the jury seen the video and found its contents enlightening (as I do), the jury might well have considered Dr. Dennert's opinion—acquired without the benefit of the video—insufficiently informed and thus less credible. From my review of the record, compared to watching the video, oral testimony falls far short of conveying how Krogmann was behaving in his chair, responding to questions, and otherwise visually and audibly expressing his state of being on the day of the shooting. The ratio in the saying "a picture is worth a thousand words" conveys an intuitive truth; with a video that ratio multiplies.

One might suppose that there's an element of irrationality in any shooting of another human being, but Krogmann's conduct that day presents layers of it. After shooting J.S. three times, Krogmann proceeds to grant her request for him to get her a pillow. He shortly thereafter leaves the room again in response to J.S.'s request to retrieve her phone so she can call her mother. After a call to his son, Krogmann calls 911, giving the address of the house (with J.S.'s assistance) and asking the dispatcher to send an ambulance because someone has been shot. Krogmann didn't immediately answer the dispatcher's question about who shot the victim in this call (he just continued to request that they send an ambulance). But in a second 911 call about two minutes later, he tells the dispatcher that he shot her. In that second call, he continues to urge the ambulance to hurry and to "please save her."[9] As the State's witnesses testified,

---

[9]After Krogmann's son arrives at the scene—the first to arrive, ahead of both police and paramedics—Krogmann lets his son take possession of the gun. His son testified that he had

a shooter calling an ambulance for a victim after a shooting isn't unheard of. But it's a course of conduct certainly at odds with itself, raising salient questions about Krogmann's mental capacity at the time. And one could certainly conclude that his conflicted actions fit with his peculiar behavior in the interview recorded a short time later.

The majority correctly concludes that the district court committed error when it denied the defense's request to play the video to the jury. We presume that an erroneous evidentiary ruling constitutes prejudicial error. *State v. Nims*, 357 N.W.2d 608, 609 (Iowa 1984) (en banc). That error requires reversal unless the record affirmatively establishes that the evidence in question did not affect the jury's finding of guilt. *State v. Elliott*, 806 N.W.2d 660, 669 (Iowa 2011). Most of our cases applying harmless error analysis to evidentiary rulings deal with erroneously *admitted* evidence. *See, e.g.*, *State v. Hildreth*, 582 N.W.2d 167, 170 (Iowa 1998) (finding harmless error for the erroneous admission of hearsay testimony). Rarely have we had occasion to apply harmless error analysis to erroneously *excluded* evidence.

Most cases finding an evidentiary error to be harmless rely on one of two theories: the cumulative nature of the evidence in question, or overwhelming evidence of guilt. *State v. Freeman*, 297 N.W.2d 363, 367 (Iowa 1980). We most frequently find harmless error when the evidence at issue is cumulative—in other words, when the evidence restates a fact already established by other evidence. *See, e.g.*, *State v. Russell*, 893 N.W.2d 307, 318 (Iowa 2017) (finding harmless error when erroneously admitted testimony was merely cumulative of other evidence at trial). Even in the rare cases involving the erroneous exclusion of evidence at trial, we have found that if the evidence is merely cumulative of other

---

taken away some of Krogmann's guns two days earlier because he was worried about his father harming himself.

evidence presented, there is no prejudice to the defendant. *See, e.g., State v. McClain,* 125 N.W.2d 764, 770 (Iowa 1964) (holding that the exclusion of an FBI report finding no flammable accelerants at the scene of a fire was harmless error because four witnesses testified to the same fact at trial).

But the video of Krogmann's interview doesn't represent cumulative evidence of an undisputed fact already in the record. The testimony by Dr. Thomas and Agent Liao characterizing Krogmann's behavior in the video was *contradictory*, not cumulative. Agent Liao testified that Krogmann was calm and cooperative during the interview, and that he tracked the questions, stayed on topic, and was able to respond. But if Krogmann appeared calm and cooperative, one might legitimately wonder why he remained firmly tethered to the chair at the waist and ankles as if he were behaving in a deranged manner. Dr. Thomas, as mentioned, described Krogmann as writhing in his chair, unresponsive to some questions, and unable to organize his thoughts. No other evidence presented at trial similarly shows Krogmann's appearance, demeanor, reactions, or responses to resolve the witnesses' divergent characterizations of Krogmann's mental state during the interview.[10]

So we turn to the ground that the majority finds dispositive in this case: that other evidence in the record provides "overwhelming" evidence of Krogmann's guilt. The majority is unimpressed by Krogmann's diminished responsibility defense and finds that the video wouldn't have added much to bolster it. That the video didn't matter much might come as a surprise to the parties. The State's appeal brief includes no argument that the video's inclusion was harmless error; indeed, the word "harmless" doesn't even appear in it.

---

[10]Agent Liao watched the video within forty-eight hours of his testimony. The State also used a transcript created from the video to refresh Agent Liao's memory while on the witness stand.

What's more, the State's vigorous efforts throughout the case urging the district court *not* to admit the video suggest that the State, for its part, was quite nervous about the video's potential impact on the jury.

In declaring evidence of Krogmann's intent to commit murder "simply overwhelming," the majority recounts testimony that Krogmann performed ordinary tasks around the time of the shooting. But both experts testified that Krogmann suffers from depression and bipolar disorder, and that people who suffer from mood disorders can behave normally between manic episodes. The State's expert (Dr. Dennert) testified that he saw nothing in the record suggesting Krogmann suffered a manic episode on the day of the shooting. But he did not watch the video showing Krogmann's behavior shortly after the shooting before forming his opinion. Krogmann's expert (Dr. Thomas) testified that she believed his demeanor in the interview video showed that he was experiencing a depressive, manic, or other episode because of his mental health disease or disorder. Dr. Thomas emphasized the importance of actually seeing on the video Krogmann's behavior around the time of the shooting in assessing his mental capacity.

The majority also makes much of the fact that Krogmann didn't immediately answer the dispatcher's question about who shot the victim in the initial 911 call. I don't find this particularly revealing considering that in a follow-up 911 call about two minutes later, Krogmann tells the dispatcher that he shot her. Recall, of course, that Krogmann himself made the initial 911 call to seek help for J.S.

The majority also cites several cases in which diminished responsibility claims have failed. But in none of the cited cases was important admissible evidence kept from the fact-finder, as in this case. Cases in which a diminished responsibility defense was in some fashion rejected are of little help in answering

the question this case presents. The majority's cited cases on diminished responsibility are factually so distinct from this case that one struggles to find in them anything at all to guide the harmless error analysis here. *See State v. Watkins*, 659 N.W.2d 526, 534 (Iowa 2003) (affirming a conviction after a bench trial where the diminished responsibility defense lacked even "theoretical application" to the "knowingly" element of the crime); *State v. Myers*, 653 N.W.2d 574, 581 (Iowa 2002) (affirming a guilty plea where both the defendant and her lawyer "made it clear at the plea hearing that she waived any defense of diminished responsibility"); *State v. Buck*, 510 N.W.2d 850, 853–54 (Iowa 1994) (affirming a conviction in a bench trial where the defendant claimed that the state's introduction of evidence about the defendant's diminished responsibility defense in its case-in-chief prejudiced him because it prevented him from withdrawing it as a defense); *State v. Freeman*, 404 N.W.2d 188, 191–92 (Iowa Ct. App. 1987) (affirming a conviction in a bench trial where the defendant presented testimony about his personality disorder that differed from his own expert's testimony); *State v. Griffin*, 389 N.W.2d 858, 861 (Iowa Ct. App. 1986) (rejecting an ineffective-assistance-of-counsel claim premised on the lawyer not asking for a diminished responsibility instruction where the only evidence related to the defendant being diabetic and there was no evidence he actually suffered from a diabetic reaction constituting diminished responsibility at the time).

The court of appeals reversed the district court and ordered a new trial, declaring that the video "goes to the heart of Krogmann's defense of diminished responsibility." It's worth noting that what the majority believes is "simply overwhelming" in this record has actually split the ten appellate judges who have now heard this case 5–5, with all three court of appeals judges on the panel unwilling to find the error harmless and two members of this court likewise

unable to find harmless error in our further review. We obviously don't decide cases adding a court of appeals panel's votes to ours. But the numbers convey a deeper point: if the question is close enough to divide this many appellate judges this narrowly, you have to wonder whether evidence of Krogmann's guilt is indeed so overwhelming.

The "overwhelming evidence" test that the majority applies in this case appears to me indistinguishable from a determination that our court simply thinks that the jury arrived at the correct result notwithstanding the error. The "correct result" test, as it's sometimes called, refers to an appellate court's consideration of all the admissible evidence—including any evidence improperly excluded in the district court—and then deciding whether it thinks the jury's finding of guilt was the correct result. This test has been rejected by courts and commentators. *See, e.g.*, *Kotteakos v. United States*, 328 U.S. 750, 764 (1946) ("[T]he question is, not were they right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision."); 7 Wayne R. LaFave et al., *Criminal Procedure* § 27.6(b), at 134–40 (4th ed. 2015) (discussing nonconstitutional harmless error standards states have adopted instead of the correct result test and noting "it is doubtful that any court today continues to adhere to that standard"); Dick R. Schlegel, *The Evolution of Harmless Error in Iowa: Where Do We Go from Here?*, 43 Drake L. Rev. 547, 590–91 (1995) (arguing against the correct result test and asserting that "[t]he appellate courts should not, under any circumstances, declare a particular error harmless on the basis of overwhelming evidence of the defendant's guilt").

Although we avoid the correct result verbiage, one might be forgiven for thinking that we've simply engaged in correct result analysis by another name when we find harmless error based on our own belief that the evidence of guilt

is "simply overwhelming," as the majority states here. "It is not within the power of [an appellate court] to determine the guilt of a defendant who has not waived the jury right, nor . . . by reviewing the facts ourselves and pronouncing the defendant without-a-doubt guilty." *Neder v. United States*, 527 U.S. 1, 32 (1999) (Scalia, J., concurring in part and dissenting in part).

Considering evidence and weighing its probative force with and against the other evidence presented is a quintessential jury function. When the court usurps this function, it "denie[s] the defendant the benefit of the presumption of innocence, the effect of his plea of not guilty, and his right to have the jury decide whether the State met its heavy burden to prove the intent element." *State v. Trudo*, 253 N.W.2d 101, 110 (Iowa 1977) (en banc) (McCormick, J., dissenting).

Though it may at first seem "convenient" not to go through the expense of another trial, it must be

> remembered that delays and little inconveniences in the forms of justice are the price that all free nations must pay for their liberty in more substantial matters; that these inroads upon this sacred bulwark of the nation are fundamentally opposite to the spirit of our constitution; and that, though begun in trifles, the precedent may gradually increase and spread to the utter disuse of juries in questions of the most momentous concern.

*Neder*, 527 U.S. at 39–40 (Scalia, J., concurring in part and dissenting in part) (quoting 4 William Blackstone, *Commentaries* *350 (1765)). The determination of guilt must reside not with appellate judges but with twelve impartial members of Krogmann's community—the jury. Krogmann's jury did not have the opportunity to weigh relevant, admissible evidence when it considered the issue that anchored his defense. I thus respectfully dissent and would remand for a new trial.

Oxley, J., joins this dissent.